**Clifton CRAWFORD and Ernest McEachern, Plaintiffs,**

**v.**

**Christopher ARTUZ, Superintendent, et al., Defendants.**

**No. 98 Civ. 0425(DC).**

United States District Court, S.D. New York.

March 22, 2001.

Clifton Crawford, Stormville, NY, Plaintiff Pro se.

Ernest McEachern, Naponoch, NY, Plaintiff Pro se.

Eliot Spitzer, Attorney General of the State of New York by Michael J. Keane, Jr., Assistant Attorney General, New York City, for Defendants.

## OPINION

CHIN, District Judge.

*Pro se* plaintiffs Clifton Crawford and Ernest McEachern are, respectively, a present and a former inmate of Green Haven Correctional Facility ("Green Haven"). They bring this action pursuant to 42 U.S.C. § 1983 against certain current or former officials of Green Haven, seeking compensatory and punitive damages for alleged violations of their rights under the First, Eighth, and Fourteenth Amendments. Specifically, plaintiffs allege that defendants (1) subjected them to cruel and unusual punishment in violation of the Eighth Amendment by exposing them to friable asbestos at Green Haven and (2) violated their First Amendment rights to freedom of religion by effectively preventing them from attending religious services at the prison mosque.

Defendants move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons set forth below, the motion is granted and the complaint is dismissed.

## BACKGROUND

### A. *The Facts*

#### 1. *The Alleged Asbestos Contamination*

Plaintiffs claim that from 1995 until the present, several areas in Green Haven have been (and, in certain cases, continue to be) contaminated by friable, or crumbling, asbestos. Plaintiffs further claim that defendants—various officials charged with maintaining Green Haven's physical plant—knew of the friable asbestos but failed to properly safeguard the safety of inmates and staff. (Crawford Aff. ¶ 8). For their part, defendants deny that plaintiffs were knowingly exposed to dangerous levels of friable asbestos. (Gastin Aff. ¶ 31). According to defendant Dan Gastin, Absestos Control Supervisor at Green Haven since 1992, no area of Green Haven

has "ever contained friable asbestos that was not immediately removed or contained." (*Id.* ¶ 30). Moreover, Gastin claims, Green Haven's policies conform to New York State code and regulations. (*Id.* ¶ 32). The four areas of contamination are discussed in turn.

### a. *The Counseling Unit*

First, plaintiffs allege that they were exposed to friable asbestos in the J–School Counseling Unit (the "Counseling Unit"), an area where prisoners receive counseling and other services.

On April 8, 1995, at approximately 8:15 a.m., Corrections Officer D. Patterson discovered that a number of tiles had fallen from the Counseling Unit's ceiling over the weekend and that a "large amount of water from the [ceiling] leaks" filled the waiting room area,[1] a large room where inmates wait until they are seen by counselors in private offices. (Crawford Aff.Ex. A; Gastin Aff. ¶ 11). In his log book entry for that date, Patterson noted that "the missing tiles, falling tiles, and leaks have been reported to maintenance *many* times." (Crawford Aff.Ex. A.) (emphasis in original). Patterson further wrote that he was going to contact Senior Counselor Levanduski about the situation and that Levanduski had been "informed of the situation in the past." (*Id.*). Patterson contacted Fire and Safety Officer Smith, who ordered the inmate waiting area and orientation rooms closed until repairs were made. (*Id.*). Gastin states that the waiting area was "immediately closed" to inmates and staff.[2] (Gastin Aff. ¶ 12).

On May 2, 1995, Patterson wrote in the log book that he notified Fire and Safety Officer Smith about "the closed area not being sealed yet." (Crawford Aff.Ex. B). In response, Smith told Patterson that he would contact maintenance again and that Patterson should submit another work order. (*Id.*). Two weeks later, on May 18, 1995, Patterson wrote in the log book that the condemned rooms (of the Counseling Unit) "have never been sealed to this point." (*Id.* Ex. C). That afternoon, C.O. Denoso and "civilian Gaston" (presumably defendant Gastin) arrived at the Counseling Unit with an inmate asbestos crew to "seal the condemned area." (*Id.*). Patterson noted in the log book that he left the Counseling Unit late that morning because the asbestos crew was still working on the Unit. (*Id.*).

Plaintiffs claim that this was not the first time that rain had caused ceiling tile in the Counseling Unit to fall. (Crawford Aff. ¶ 12). The Counseling Unit was not closed to inmates until July 1996, when equipment from the Counseling Unit was transferred to another building. (*Id.* Ex. E). By July 8, 1996, Artuz, Seitz, Haponik, Bliden, Richards, Smith, and Lyman all knew of the asbestos in the Counseling Unit.[3] (*Id.* ¶ 15, Ex. F).

Air sampling tests taken in the east area of the Counseling Unit on September 1996 revealed .005 fibers of asbestos per cubic centimeter.[4] (*Id.* Ex. X). On November

---

1. According to Gastin, the ceiling tiles fell on April 10, 1995. (Gastin Aff. ¶ 10).

2. The log book entry for April 10, 1995, indicates that the Counseling Unit was re-opened at 12:20 p.m. that day, but it does not specify whether it was opened to all inmates or only repairmen at that time. (Crawford Aff.Ex. A).

3. An asbestos project notice of that date was copied to Artuz, Seitz, Haponik, Bliden, and Richards; Smith and Lyman were listed as contacts. (Crawford Aff.Ex. F).

4. Plaintiffs apparently allege that the level of asbestos in the Counseling Unit was unsafe, for "the result of the test [wa]s above the detection limit." (Crawford Aff. ¶ 46). As plaintiffs acknowledge, however, the "safe

19, 1996, preparation for asbestos removal was commenced in the Counseling Unit; the project started on December 2, 1996, and did not end until October 10, 1997, when all the asbestos was removed. (Gastin Aff. ¶¶ 13–15).

### b. *The Mosque*

Plaintiffs next allege that they were exposed to friable asbestos when the ceiling of the Green Haven Masjid Taubah (the "Mosque") collapsed due to rain.[5] (Crawford Aff. 17). The Mosque is an area designated for Muslim worship and religious activities. (*Id.* ¶ 20). Both plaintiffs are practicing Muslims.[6] (Compl.¶¶ 33, 52).

On August 23, 1996, McEachern, along with two other Green Haven inmates certified in asbestos handling, was escorted to a room in the Mosque to examine its ceiling. (Crawford Aff.Ex. AA). Upon inspection, it was determined that the ceiling contained sprayed-on asbestos fireproofing that had started to deteriorate from the rain. (*Id.*).

On September 4, 1996, the New York State Department of Labor's Division of Safety and Health received a complaint about asbestos in the Mosque from Asim Bomani, another inmate at Green Haven.

(*Id.* Ex. H). According to the complaint, the ceiling in one of the Mosque's rooms had collapsed. The ceiling was covered with asbestos, the room had not been sealed, and inmates were exposed to particles from the room on rainy or humid days. (*Id.*). The complaint was referred to Industrial Hygenist Sylvester Murray from the Department of Labor. (*Id.*).

On September 5, 1996, Murray, accompanied by defendants Haponik and Maintenance Supervisor Richard Muller, conducted an on-site inspection of the Mosque areas referenced in Bomani's complaint.[7] In an inspection report dated September 6, 1996, Murray reported that the ceiling in question "had open areas in it and appeared to be undergoing deterioration[;] however[,] no reconstruction was occurring on it." (*Id.* Ex. G). Murray also noted that the door to the potentially contaminated area was closed but not locked. (*Id.*). Upon inspecting the area, Murray informed Haponik and Muller that a licensed asbestos contractor with a certified group of laborers would be necessary for reconstruction if the ceiling contained asbestos. (*Id.*). The Mosque was not closed immediately. (*Id.* ¶ 18). An asbestos abatement project was commenced in October 1996, which resulted in the removal

---

level" of asbestos is .01 fibers per cubic centimeter or the background level, whichever is greater. (N.Y.CRR 56–17.8, attached to Crawford Aff. as Ex. Z). Thus, the level of asbestos found in the Counseling Unit (.005 f/cc) was within state guidelines.

Plaintiffs have also submitted air sample analysis reports for the "Upper Deck HEAP Office," which show asbestos levels as high as .20 f/cc on November 14, 1996. (Crawford Aff. ¶ 47, Ex. Y). The record does not reveal, however, whether the HEAP Office is in the Counseling Unit.

5. Although no specific date of the collapse is provided, it appears to have occurred in late August or early September 1996. (*See* Crawford Aff.Exs. G, H)

6. Although McEachern does not specifically state that he is a practicing Muslim, he does allege in the complaint that he "ha[s] not been able to attend religion service since August 23, 1996, due to friable asbestos within the masjid." (Compl.¶ 53). I will thus assume, for the purposes of this motion, that McEachern practices the Muslim faith.

7. Although Crawford claims that the inspection took place on September 10, 1996, the inspection report states that the inspection took place on September 5, 1996. (Crawford Aff. ¶ 18, Ex. G).

of approximately seventy bags of friable asbestos.[8] (*Id.* Ex. AA).

Gastin states that the areas in the Mosque that contain asbestos are closets not normally used by inmates. (Gastin Aff. ¶ 4). As a precaution, background asbestos air samples of the East and West Closets were taken on October 2, 1996; the results were, according to Gastin, within acceptable limits. (*Id.* Aff. ¶¶ 5, 8, Exs. A, B). Pre-abatement samples were taken from the East Closet on October 11, 1996, and the results were also found to be within acceptable limits. (*Id.* ¶ 6, Ex. A). Final air samples of the East and West Closets were taken on October 19, 1996, and the results of both were within acceptable limits, as defined by New York State Industrial Code, and met all applicable re-entry requirements. (*Id.* ¶¶ 7, 9, Exs. A, B).

Crawford challenges this assessment, asserting that the background asbestos air samples for the East and West Closets were "very high and not within acceptable limits." (Crawford Aff. ¶¶ 18, 43–45). Crawford further states that air samples are currently outside acceptable limits. (*Id.* ¶ 19, Exs. U–X). As plaintiffs acknowledge, however, the "safe level" of asbestos established by the state is .01 fibers/cubic centimeters. (*Id.* Ex. Z). The ambient air sample taken from the Mosque in July 1998 showed .005 and .006 fibers/cubic centimeters. (*Id.* Ex. W). In fact, of the 36 readings provided to the Court that are clearly for the Mosque, only two exceed .01 f/cc, and neither of them exceed .012 f/cc. (*Id.* Exs. U–Y; Gastin Aff.Exs. A–B).

As of July 13, 1998, Gastin reported that tiles were still missing from the Mosque's ceiling in two rooms. (Crawford Aff.Ex. OO). Gastin then set up a schedule for cleaning, which was to close off the Mosque until Friday, July 17. (*Id.*). No further information about asbestos removal in the Mosque has been provided.

As of March 8, 2000, "Jumah Services" for Muslim inmates were moved from the Mosque to a gymnasium. (*Id.* ¶ 21). Services continue to be held in the gymnasium. (*Id.*, Ex. I).

### c. *Law Library*

Plaintiffs next claim that they were (and, in Crawford's case, continue to be) exposed to friable asbestos in the Green Haven law library (the "Law Library"). (*Id.* ¶ 22). Specifically, plaintiffs contend that holes in the ceiling of the Law Library have exposed friable asbestos to inmates using the facility.

The ceiling of the Law Library consists of individual tiles, above which run pipes lined by spray-on fireproofing.[9] (Gastin Aff. ¶ 26–27). Sometime in or before December 1996, several tiles fell from the Law Library's ceiling. It is unclear to the Court how Green Haven personnel responded to the problem. In his affidavit, Gastin states that he "sealed up all holes in the Law Library ceiling" on December 20, 1996 and, whenever he thereafter learned of missing tiles, "would immediately seal the hole[s] in the Law Library's ceiling."[10] (*Id.* ¶ 28–29). Other Green Haven personnel acknowledged the situation by December 30, 1996, when defendant Richards

---

8. The record does not indicate whether the removal of seventy bags completely eliminated the asbestos problem in the Mosque or merely a portion of it.

9. According to Gastin, spray-on fireproofing "is normally not friable." (Gastin Aff. ¶ 27).

10. Gastin's continued efforts to seal the ceiling tiles in the Law Library are evidenced by his log book entries; as late as June 2, 1998, Gastin was engaged in "seal[ing] up ceiling tiles ... in the law library." (Crawford Aff. Ex. MM).

sent an internal memorandum to the Inmate Grievance Resolution Coordinator stating, "Approved encapsulation methods are sceduled [sic] to begin on 12/30/96 in the Law Library. This should alleviate the problems in the area." (Crawford Aff. Ex. J).

An encapsulation (or containment) of the Law Library was performed in December 1996 or January 1997.[11] (*Id.* ¶ 22). Under New York law, an encapsulation (or containment) procedure must be conducted in accordance with 12 NYCRR Part 56–12. In particular, the work area must be cleaned and isolated in accordance with subpart 56–8 of the NYCRR, which mandates the use of encapsulants to hold asbestos in place. (*Id.* Ex. CC). McEachern states that, based on his training as an asbestos handler, the Law Library encapsulation was not conducted in accordance with the above procedures, but that inmates assigned to the job only taped sheets of polyethylene over broken, fallen ceiling tiles. (*Id.*). Moreover, plaintiffs contend, sealing holes in the Law Library ceiling does not stop friable asbestos. (*Id.* ¶ 33). No air sampling analysis reports of the Law Library were given to plaintiffs during discovery. (*Id.*).

The encapsulation did not quell inmates' complaints about asbestos in the law library. Three months later, in March 1997, William Pabon, another Green Haven inmate, wrote to defendant Artuz about asbestos in several areas, including the Law Library. (*Id.* Ex. K). Artuz responded by letter dated March 24, 1997, and advised Pabon that he had forwarded his letter to defendant Haponik and that he "should be hearing from a staff member in the near future." (*Id.*). On April 7, 1997, defendant Richards wrote to Pabon about his complaints, but did not mention the condition of the Law Library. (*Id.* Ex. L).[12] As of September 9, 1997, the Law Library encapsulation had not been completed. (*Id.* Ex. N).

According to plaintiffs, since the initial encapsulation of the Law Library was performed, "the encapsulation" has begun to "fall" from the ceiling, exposing inmates in the Law Library to more friable asbestos. (*Id.* ¶ 22). Fans in the Law Library further disturb the asbestos. (*Id.*). As of October 2000, the law library had not been further encapsulated, and remains open to inmates. (*Id.* ¶ 28).

#### d. *Inmate Housing Units*

Finally, plaintiffs claim that they have been exposed to friable asbestos in the Green Haven Inmate Housing Units (the "Housing Units"). (*Id.* ¶ 34). In particular, plaintiffs contend that the catwalks of the various cellblocks contain friable asbestos. (*Id.* ¶ 34).

The catwalks to which plaintiffs refer are access ways that run between and behind rows of Housing Unit cells. (Gastin Aff. ¶ 16). Inmates normally have no access to the catwalks, which contain water pipes, electrical and radio lines, as well as other utilities. (*Id.* ¶¶ 17, 18). According to Gastin, the asbestos on the catwalks' pipe insulation is "normally non-friable." (*Id.* ¶ 19). A steel backing separates the catwalks from the cell, with access from the cell for ventilation. (*Id.* ¶ 20).

At various points during 1995–1998, Green Haven personnel performed asbestos removal in several Housing Unit

---

**11.** It is unclear to the Court whether Gastin's sealing of the holes constituted an encapsulation.

**12.** Richards stated that he "noted various ceiling tiles missing in physical therapy, Veteran's Self–Help area and pre-release," but did not mention the Law Library. (Crawford Aff.Ex. L).

blocks. Removal of asbestos in the cell-blocks occurred as follows: abatement in the A block catwalk began on November 24, 1995, with an estimated end date of January 31, 1996; abatement in the B block catwalk began on February 5, 1996, with an estimated end date of March 31, 1996; abatement in the E and F block catwalks began January 18, 1998, with an estimated end date of April 15, 1998; and abatement in the G and H block catwalks began on July 20, 1998, with an estimated end date of September 25, 1998. (*Id.* ¶¶ 21–15, Ex. C; Crawford Aff.Ex. R). Gastin claims that all of the asbestos in the Housing Unit catwalks was removed by September 1998. (Gastin Aff. ¶ 25).

In an application to the State Department of Labor requesting a variance for asbestos removal in the C and D blocks, defendant Lyman stated as follows:

> There is over 6,800 ln. ft of ACM pipe insulation located in the pipe galler[ies] of "C" and "D" Blocks.... Nearly all this insulation is water damaged. Much of the pipe covering is physically damaged and dislodged due to abuse, maintenance in the area and age. Because of this damage and the confines of the area most of the surfaces in the pipe gallery are considered contaminated. Large pieces of ACM are lying on ledges and other components. The pipe gallery wall surfaces are nonporous.

(Crawford Aff.Ex. S).

Defendants have provided neither air sampling analyses for all the cell blocks nor background air samples. (*Id.* ¶ 39).

### 2. *Plaintiffs' Medical Conditions*

#### a. *Crawford*

Crawford suffers from reduced lung capacity, a condition that he claims he did not experience until he was exposed to friable asbestos.[13] (*Id.* ¶ 56). Five x-rays of Crawford conducted between 1977 and 1990 all indicate normal heart and lungs.[14] (Id.Ex. GG). An x-ray report dated September 17, 1996, also states that Crawford's heart tested normal, but asserts that the exam revealed a "5mm calcified focus in LUL posteriorly." (*Id.*). On November 5, 1996, Crawford underwent a CAT scan of his chest, which showed calcific densities in the paratracheal and left perihilar region—a condition diagnosed by a Green Haven doctor as "suggestive of old granulomatous disease." (*Id.* Ex. HH). Two months later, Crawford was tested for pulmonary function at an off-site hospital. The results of that examination revealed a total lung capacity of 63%, an outcome the examining physician characterized as "abnormal" and "appear[ing] to demonstrate at least a mild to moderate restrictive defect." (*Id.* Ex. II). After a pulmonary examination conducted in January 1999, Crawford was diagnosed with mild restrictive lung disease and minimal hypercapnia (the doctor added, "Clinical correlation is suggested"). (*Id.* Ex. JJ).

Defendants provide the affidavits of two medical personnel to rebut Crawford's claims of current and future injury. The

---

**13.** Crawford smoked cigarettes for 15 years before quitting in 1991. (Crawford Aff.Ex. II)

**14.** The records state as follows: (1) x-ray report dated May 25, 1977, "Lungfields are clear and heart and great vessels within limits of normal"; (2) x-ray report dated August 17, 1978, "The heart and lungs as well as the visualized bony and mediastinal structures ... appeared unremarkable ... Normal chest"; (3) x-ray report dated May 14, 1980, "Front chest study shows the heart and lungs to be normal"; (4) x-ray report dated April 18, 1989, "Heart, lungs and mediastinum appear normal;" and (5) x-ray report dated December 18, 1990, "PA and lateral films of the chest show the lung fields to be clear.... The heart is normal in size and configuration." (Crawford Aff.Ex. GG).

first is Dr. Norman Selwin, Acting Facility Health Services Director at Green Haven. (Selwin Aff. ¶ 1). Upon review of Crawford's medical records, Selwin concluded that Crawford never sought medical attention for asbestos exposure. (*Id.* ¶¶ 3–4). Rather, Selwin stated, Crawford's records from November 1996 reveal sinusitis and old granulomatous disease, "which has no direct nexus or correlation to asbestos exposure." (*Id.* ¶¶ 5–8). Finally, Selwin noted that Crawford has no present physical manifestation of asbestos exposure, nor any "pulmonary defect which can be attributed" to asbestos exposure. (*Id.* ¶¶ 9–10).

The second physician, Dr. Neil Schluger, is Chief of Clinical Pulmonary Medicine and Associate Professor of Medicine and Public Health at Columbia University College of Physicians and Surgeons. (Schluger Aff. ¶¶ 2, 3). A specialist in pulmonary disease, Schluger writes, publishes, and teaches about respiratory infections, and he is qualified to diagnose and treat patients with asbestos-related illnesses. (*Id.* ¶ 3–4). Upon review of Crawford's medical records, Schluger concluded that they show "no symptoms of any asbestos-related disease," no "present physical manifestation or pulmonary defect which can be attributed to" asbestos exposure, and no lesions that could be a precursor to mesothelioma (a cancer associated with asbestos exposure). (*Id.* ¶¶ 7, 9). Although the records do indicate a reduced lung capacity, this condition "could be attributable to a large number of factors, but [is] not necessarily attributable to exposure to friable asbestos." (*Id.* ¶ 8).

Finally, Schluger questioned whether the level of asbestos exposure alleged by Crawford could ever result in any asbestos-related disease. (*Id.* ¶ 11). Even based on six years of exposure, Schluger considered it "extremely unlikely that such a trivial exposure ... would ever manifest in any asbestos-related disease." (*Id.*). Moreover, Schluger concluded, "[g]iven the alleged exposure and Mr. Crawford's medical condition as revealed by his medical records, Mr. Crawford is not likely to develop any asbestos-related disease in the future." (*Id.*).

### b. *McEachern*

Unlike Crawford, McEachern does not allege any present injury due to asbestos exposure, but merely claims that there is "a high probability that [he] will be rendered sick, sore, lame and disabled." (Compl. ¶ 57).

McEachern was an inmate at Green Haven from August 2, 1996, through the filing of the complaint (Compl. ¶ 52), and he worked as an asbestos handler at the facility from September to November 1996. (Crawford Aff. Ex. BB). As part of his training (which took place during his incarceration at Attica Correctional Facility), McEachern underwent a physical, including chest x-rays. (*Id.*). After he was terminated in November 1996, McEachern claims that he received no testing or medical treatment for asbestos exposure from any members of the Green Haven medical staff. (*Id.*).

McEachern's medical records were reviewed by two medical personnel, who have each submitted affidavits in support of defendants' motion. Cheree Lemmerman, a registered nurse employed as Nurse Administrator at Eastern Correctional Facility, stated that the records indicate McEachern only complained to prison health officials of asbestos exposure on two occasions. (Lemmerman Aff. ¶¶ 1, 2, 4–6). On the first occasion, McEachern stated during a September 12, 1996, medical examination that he had been "[e]xposed to asbestos and want[ed] a chest x-ray." (*Id.* ¶ 5; Small Aff. Ex. B). This request was

apparently denied.[15] (Small Aff.Ex. B). A year and a half later, in March 1998, McEachern again told medical personnel of his asbestos concerns. (Lemmerman Aff. ¶ 6). This time, an x-ray was conducted, and McEachern was diagnosed as having "no asbestos disease." (Small Aff.Ex. B).[16] Based on the results of these examinations, Lemmerman concludes that McEachern "has absolutely no physical manifestations of exposure to asbestos." (Lemmerman Aff. ¶ 11).

Dr. Schluger also examined McEachern's medical records and concluded that they reveal no symptoms of pulmonary or asbestos-related disease, no pulmonary complaints, and no lesion that could be a precursor to mesothelioma. (Schluger Aff. ¶ 6, 13). As with Crawford, Schluger further concluded that the level of asbestos exposure alleged by McEachern, even two years worth, was trivial, that it would be extremely unlikely that such an exposure ... would ever manifest in any asbestos-related disease, and that McEachern is thus "not likely to develop any asbestos-related disease in the future." (*Id.* ¶ 12)

## B. *Prior Proceedings*

Plaintiffs commenced this action on December 1, 1997. Plaintiffs were granted *in forma pauperis* status, the complaint was filed with the Clerk of the Court, and the case was assigned a docket number on January 22, 1998. Plaintiffs immediately applied for a temporary restraining order and preliminary injunction seeking to enjoin defendants from exposing them and other inmates to friable asbestos and from engaging in any form of retaliation against them for filing this action. The Court denied that application by order dated May 19, 1998. Plaintiffs moved for reconsideration of the May 19, 1998, order, but the motion was denied on June 26, 1998. Defendants answered the complaint on July 2, 1998.

Defendants subsequently moved for judgment on the pleadings, arguing, *inter alia,* that the Eleventh Amendment barred plaintiffs' monetary claims against defendants in their official capacities, and that the plaintiffs failed to alleged defendants' personal involvement in the allegedly wrongful conduct. In a memorandum decision dated June 23, 1999, I denied defendants' motion in all respects, except that plaintiffs' claims against the New York State Department of Labor and the remaining defendants in their official capacities were dismissed with prejudice as barred by the Eleventh Amendment. *See Crawford v. Artuz,* 98 Civ. 0425(DC), 1999 WL 435155, *3–4 (S.D.N.Y. June 23, 1999).[17]

Upon the completion of discovery, defendants filed this motion for summary judgment.

## DISCUSSION

Defendants move for summary judgment pursuant to Federal Rule of Civil Procedure 56 on four separate grounds.

---

15. The medical records for that date are difficult to decipher, but they apparently state that McEachern was advised that there was no need for an x-ray at that time and that he was not due for OSHA asbestos monitoring. (Small Aff.Ex. B).

16. Lemmerman also notes that an "asbestos physical" was conducted in March 1996, and the chest x-ray came back normal. (Lemmerman Aff. ¶ 5; Small Aff.Ex. B).

17. The remaining defendants are Christopher Artuz, Superintendent of Green Haven; Robert Seitz, First Deputy Superintendent; Gayle Haponik, Deputy Superintendent of Administration; Dennis Blinden, Deputy Superintendent of Programs; Jeff Richards, Plant Superintendent; Dan Gastin, Asbestos Control Supervisor; George Smith, Industry Superintendent; and Mark Lyman, Asbestos Control Coordinator.

First, they argue that plaintiffs have failed to demonstrate that defendants acted with deliberate indifference in subjecting them to dangerous levels of friable asbestos. Second, defendants contend that plaintiffs are not entitled to relief because they have not established present physical injury or a reasonable likelihood of developing future physical injury. Third, defendants argue that plaintiffs' claims are barred by the Eleventh Amendment. Finally, defendants argue that plaintiffs' claims are barred by the doctrine of qualified immunity.

### A. *Summary Judgment Standard*

The standards governing motions for summary judgment are well-settled. A court may grant summary judgment only where there is no genuine issue of material fact and the moving party is therefore entitled to judgment as a matter of law. *See* FedR.Civ.P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Accordingly, the Court's task is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). To create an issue for trial, there must be sufficient evidence in the record to support a jury verdict in the nonmoving party's favor. *See id.*

To defeat a motion for summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348. As the Supreme Court stated in *Anderson*, "if the evidence is merely colorable, or is not significantly probative, sum-

mary judgment may be granted." *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505 (internal citations omitted). The nonmoving party may not rest upon mere conclusory allegations or denials, but must set forth "concrete particulars" showing that a trial is needed. *National Union Fire Ins. Co. v. Deloach*, 708 F.Supp. 1371, 1379 (S.D.N.Y.1989) (quoting *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir.1984) (internal quotation marks omitted)).

### B. *Eighth Amendment Claims*

Defendants challenge the merits of plaintiffs' Eighth Amendment claims on essentially three grounds, alleging that (1) plaintiffs were not exposed to dangerous levels of asbestos; (2) plaintiffs cannot establish deliberate indifference on the part of defendants; and (3) plaintiffs cannot establish present physical injury or a reasonable likelihood of future physical injury. Because I find that no reasonable jury could find that plaintiffs suffer from present physical injuries or an unreasonable risk of future injuries, I do not reach the merits of defendants' first and second arguments;[18] and I assume—for the purposes of this motion only—that genuine issues of fact exist with respect to those arguments.

The Eighth Amendment protects prisoners from unconstitutional conditions of confinement. To challenge such conditions, a prisoner must show that prison officials, acting with deliberate indifference to the prisoner's safety, subjected the prisoner to a sufficiently serious deprivation. *See Dawes v. Walker*, 239 F.3d 489, 493 (2d Cir.2001) (amended Feb. 23, 2001); *McPherson v. Coombe*, 174 F.3d 276, 280 (1999). This requires a showing of both

---

**18.** I also do not reach the merits of defendants' Eleventh Amendment and qualified immunity arguments.

objective and subjective elements. With respect to the objective element, the alleged deprivation must be so serious as to be "considered cruel and unusual." *Doyle v. Coombe,* 976 F.Supp. 183, 186 (W.D.N.Y. 1997); *see also Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (stating that a "prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities") (internal quotation marks omitted). With respect to the subjective element, "the prison official involved must have acted with a sufficiently culpable state of mind." *McPherson v. Coombe,* 174 F.3d 276, 280 (1999) (quoting *Farmer,* 511 U.S. at 834, 114 S.Ct. 1970 (1994)) (internal quotation marks omitted). Where, as here, the plaintiffs challenge the condition of their confinement, the relevant state of mind is deliberate indifference.[19] *Id.*

The Supreme Court has held that a prisoner may bring an Eighth Amendment claim for exposure to toxic contaminants even if no present physical injury is alleged. *See Helling v. McKinney,* 509 U.S. 25, 32–35, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993). In such an instance, the prisoner must demonstrate that the exposure "pose[s] an unreasonable risk of serious damage to his future health." *Id.* at 35, 113 S.Ct. 2475. The Court admonished, however, that:

> determining whether [plaintiff's] conditions of confinement violate the Eighth Amendment requires more than a scientific inquiry into the seriousness of the potential harm and the likelihood that such injury to health will actually be caused by exposure to [the toxin]. It

also requires a court to assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk.

*Id.* at 36, 113 S.Ct. 2475 (emphasis in original). The Second Circuit has applied *Helling* to inmates' claims of exposure to friable asbestos while in prison. *See LaBounty v. Coughlin,* 137 F.3d 68, 72 (2d Cir.1998).

The issue relevant to this case is whether, drawing all inferences in favor of plaintiffs, a reasonable jury could find that plaintiffs' exposure to friable asbestos at Green Haven has caused Crawford present injury or poses an unreasonable risk of serious damage to Crawford or McEachern's future health.[20] Upon careful examination of the evidence presented by both sides, I conclude that no reasonable jury could find for plaintiffs on these issues. Accordingly, plaintiffs' Eighth Amendment claims must be dismissed.

### 1. *Crawford's Present Injury*

■ With respect to his claimed present injury, Crawford introduces two pieces of evidence. First, he submits medical reports establishing that he suffers from both a reduced lung capacity and calcific densities in the paratracheal and left perihilar region, a condition diagnosed as old granulomatous disease. (Crawford Aff.Ex. HH). Second, Crawford states that he did not experience these conditions prior to his exposure to friable asbestos at Green Haven. (*Id.* ¶ 56).

219 F.3d 132, 137 (2d Cir.2000) (quoting *Farmer,* 511 U.S. at 847, 114 S.Ct. 1970).

**20.** As explained above, McEachern does not allege present physical injury.

---

**19.** A prison official acts with deliberate indifference when he "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Harrison v. Barkley,*

When considered in light of the affidavits from Dr. Schluger and Dr. Selwin, however, Crawford's claims do not create a genuine issue of fact. According to Dr. Selwin, old granulamatous disease bears "no direct nexus or correlation to asbestos exposure." (Selwin Aff. ¶ 8). Moreover, both doctors state in their affidavits that "[t]here is no indication [from Crawford's medical records] that Mr. Crawford has any present physical manifestation or pulmonary defect which can be attributed to exposure to asbestos." [21] (Schluger Aff. ¶ 9; Selwin Aff. ¶¶ 9–10). While there is no dispute that Crawford currently suffers from a lung injury, that injury's mere temporal proximity to asbestos exposure does not mean that the injury was caused by asbestos.[22] Because Crawford has presented no concrete evidence to rebut defendants' ample showing that he does not currently suffer from an asbestos related injury, no genuine issue of fact exists with respect to a present asbestos-related injury. Accordingly, Crawford's Eighth Amendment claims based on an alleged present injury must be dismissed.

### 2. *Crawford and McEachern's Risk of Future Injury*

■ A prisoner may state a deliberate indifference claim under the Eighth Amendment even if he suffers no present injury, so long as he demonstrates that the challenged deprivation "pose[s] an unreasonable risk of serious damage to his future health." *Helling,* 509 U.S. at 35, 113 S.Ct. 2475. Based upon the record before the Court, no reasonable jury could find that plaintiffs face an unreasonable risk of serious damage to their future health.

Plaintiffs have provided the following evidence to support their claims that they face an increased risk of future injury: (1) Crawford's affidavit stating that there is no safe level of asbestos exposure; and (2) excerpts from a 1980 U.S. Department of Labor/Occupational Safety and Health Administration publication, which warn that studies suggest "significant [asbestos-related] disease can occur" in a person who has been exposed to asbestos for only one day. (Crawford Aff.Ex. KK). In contrast, Dr. Schluger characterizes the levels of exposure alleged by each plaintiff as trivial and concludes with respect to each plaintiff that: "It is extremely unlikely that such a trivial exposure, even if it did occur, would ever manifest in any asbestos-related disease. Given the alleged exposure and [plaintiffs'] medical condition as revealed by [the] medical records, [plaintiffs are] not likely to develop any asbestos-related disease in the future." (Schluger Aff. ¶ 11, 12). When considered in light of this assessment, plaintiffs' conclusory allegations—even when combined with the twenty year old OSHA pamphlet—do not create a genuine issue of fact concerning plaintiffs' risk of injury.

Even if plaintiffs could establish that they face a risk of serious future injury, their claims would not survive summary judgment. *Helling* requires a more rigorous showing than plaintiffs have presented. *See Helling,* 509 U.S. at 36, 113 S.Ct. 2475. Given the evidence provided by defendants' medical personnel, I hold that, as a matter of law, the risk plaintiffs complain

---

21. Dr. Schluger also notes that asbestos-related diseases normally appear only after very long periods of time, and that, in fact, "manifestations of asbestos-related diseases within ten years of exposure are extremely unlikely." (Schluger Aff. ¶ 10). This further supports the conclusion that Crawford's present lung condition cannot be attributed to asbestos exposure.

22. Indeed, plaintiff smoked cigarettes for more than fifteen years before quitting a decade ago. (Crawford Aff.Ex. II).

of is not "so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk." *Id.; see also Smith v. Montefiore Med. Center–Health Servs. Div.*, 22 F.Supp.2d 275, 282 n. 5 (S.D.N.Y.1998).

The Second Circuit's decision in *LaBounty* does not compel a different conclusion, for it involved a much less developed factual record. In *LaBounty*, plaintiff, an inmate at Woodbourne Correctional Facility, claimed that exposure to chemicals in the prison's drinking water and asbestos had "caused him to suffer myriad illnesses." *LaBounty*, 137 F.3d at 70. Neither plaintiff nor defendants submitted any documentary evidence to support their arguments. *Id.* at 73. Based on the lack of evidence, the Second Circuit upheld the district court's denial of summary judgment on the asbestos claims, finding that issues of fact existed as to whether plaintiff was exposed to friable asbestos and whether defendants acted with deliberate indifference. *Id.* Here, plaintiffs and defendants have submitted extensive documentation of asbestos exposure at Green Haven as well as plaintiffs' medical condition. Because the record in this case is sufficiently developed, the holding of *LaBounty* does not preclude a finding in favor of defendants. Accordingly, defendants' motion for summary judgment on plaintiffs' Eighth Amendment claims is granted in all respects. *See also Henderson v. Sheahan*, 196 F.3d 839 (7th Cir.1999) (upholding summary judgment on plaintiff's Eighth Amendment second-hand smoke claim where plaintiff's expert only testified that excessive exposure to second-hand smoke caused a twenty percent risk of future injury) (applying Illinois law).

## C. *First Amendment Claims*

■ Defendants also moved for summary judgment with respect to plaintiffs' First Amendment claims. Although the complaint does not explicitly set forth the claims, plaintiffs appear to be claiming that, by allowing certain rooms of the Mosque to become contaminated with friable asbestos and then failing to respond appropriately, defendants violated plaintiffs' right to practice their religion because plaintiffs have been unable to attend religious services or classes in the Mosque since May 1996.[23] (Compl.¶¶ 35, 52).

"The standard for determining whether a prison official's conduct violates an inmate's First Amendment free exercise rights is one of reasonableness, taking into account whether the particular regulation affecting some constitutional right asserted by a prisoner is reasonably related to legitimate penological interests." *Benjamin v. Coughlin*, 905 F.2d 571, 574 (2d Cir.1990) (internal citations omitted); *see also O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987). Moreover, it is "well-established that prisoners have a constitutional right to participate in congregate religious services." *Salahuddin v. Coughlin*, 993 F.2d 306, 308 (2d Cir.1993).

Defendants' motion for summary judgment is granted. Plaintiffs have failed to set forth any evidence from which a reasonable jury could find that defendants violated plaintiffs' First Amendment rights. For example, plaintiffs have not alleged that they have been unable to practice their faith, or that they have been unable to pray with other inmates. They do not state whether alternative facilities

**23.** This date applies to Crawford. McEachern states that he was unable to attend religious services in the Mosque beginning August 23, 1996. (Compl.¶ 52). He was terminated in November 1996.

were provided for Muslim inmates. They allege only that they were prevented from using the Mosque because of the asbestos. Moreover, plaintiffs have not presented evidence from which a reasonable jury could find that defendants acted unreasonably. Defendants took action as soon as they received notice of a problem in the Mosque. They promptly commenced an asbestos abatement program and removed some 70 bags of friable asbestos. Samples taken thereafter showed results within the normal range. Accordingly, plaintiff's First Amendment claim must be dismissed.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is granted and the complaint is dismissed with prejudice. The Clerk of the Court is directed to close the case.

SO ORDERED.