Charles PACK, Plaintiff,

v.

**Christopher ARTUZ, Superintendent of Green Haven Corr. Fac., Gayle Haponick, Deputy Superintendent of Administration, Jeff Richards, Plant Superintendent, Dan Gastin, Asbestos Control Supervisor, Defendants.**

No. 99 CIV. 4604(VM).

United States District Court,
S.D. New York.

Sept. 27, 2004.

Mr. Charles Pack, Long Island City, NY, for Plaintiff.

Michael J. Keane, Esq., Assistant Attorney General for the State of New York City, for Defendants.

### DECISION AND ORDER

MARRERO, District Judge.

Plaintiff, Charles Pack ("Pack"), *pro se*, brought this action pursuant to 42 U.S.C. § 1983 against the Superintendent and other employees of the Green Haven Correctional Facility ("Green Haven") of the New York State Department of Correctional Services ("DOCS"). Pack claims that DOCS officials subjected him to exposure to potentially dangerous levels of asbestos in the course of his custody at Green Haven, and that this conduct constituted violations of the First and Eighth Amendments of the United States Constitution. DOCS moved for summary judgment and Pack responded. Magistrate Judge Michael H. Dolinger, to whom this Court referred the matter, issued a Report and Recommendation (the "Report") dated September 2, 2004, recommending that DOCS's motion be granted and that Pack's claims be dismissed in their entirety. The

Report is incorporated and attached hereto. To date Pack has filed no objections.

Pursuant to 28 U.S.C. § 636(b)(1)(C), the Court may accept, reject, or modify the findings and recommendation contained in the Magistrate Judge's Report. The Court has reviewed the full record of this case, including each of the claims Pack raises, the parties' papers submitted in connection with DOCS's motion for summary judgment and the analysis and conclusions with respect thereto contained in Magistrate Judge Dolinger's Report. On this basis the Court finds that the factual findings and the legal principles and authorities relied upon by Magistrate Judge Dolinger in recommending the granting of DOCS's motion are sufficiently compelling to support the recommendation of the Report in its entirety. Accordingly, the Court accepts the Report.

## ORDER

For the reasons discussed above, it is hereby

**ORDERED** that the motion of defendants herein for summary judgment dismissing the complaint of Plaintiff Charles Pack in its entirety is granted.

The Clerk is directed to close this case.

SO ORDERED.

1. Defendants' motion and memorandum of law address only Pack's Eighth Amendment claim. For reasons to be noted, however, we do not view plaintiff's articulated First Amendment claim as implicating different factual issues, and hence view the failure of plaintiff's proof of an Eighth Amendment violation as fatal to his apparent First Amendment theory.

2. Pursuant to the "prison mailbox rule," plaintiff is deemed to have filed his complaint on the date he executed it, rather than on the date that it was actually filed with the Clerk of

## REPORT AND RECOMMENDATION

DOLINGER, United States Magistrate Judge.

*Pro se* plaintiff Charles Pack commenced this action, pursuant to 42 U.S.C. § 1983, against four employees of the Department of Correctional Services ("DOCS"), all of whom work at Green Haven Correctional Facility. Plaintiff claims that defendants failed to protect him from exposure to potentially dangerous levels of asbestos during his incarceration at Green Haven, in violation of his First and Eighth Amendment rights.

Defendants now move for summary judgment on Pack's Eighth Amendment claim, principally on the grounds that plaintiff has failed to establish a constitutional violation and that, in any event, defendants are entitled to qualified immunity. For the following reasons we recommend that the motion be granted.[1]

## BACKGROUND

Pack filed this action on May 10, 1999[2], alleging that during his incarceration at Green Haven between August 8, 1991 and November 24, 1998, defendants failed to protect him from exposure to friable asbestos, in violation of his First and Eighth Amendment rights. (Doc. # 2, Form Complaint ("Compl.") at ¶¶ IV(1) & (9)-(11); Plaintiff's Statement of Facts ("Pltff's Facts") at ¶ 1).[3] Specifically,

Court. *See Noble v. Kelly,* 246 F.3d 93, 97–98 (2d Cir.2001).

3. Pack had initiated a prior action in this court, involving the same defendants and the same allegations of asbestos exposure. (*See* Defts' 56.1 Exhibit A, Amended Complaint filed on May 4, 1998). On December 30, 1998, this action was dismissed without prejudice on the ground that plaintiff had failed to exhaust his administrative remedies. (*See* Case No. 98–CIV–4712, Docket Entry No. 10).

plaintiff alleges that he was exposed to friable asbestos in four areas of the Green Haven facility—the prison mosque known as Sankore at Taubah–Masjid, the J–School Counseling Unit, the Law Library, and Blocks A, E, F, and H of the inmate housing units. (Compl. at ¶¶ IV(18)-(25)). As a result of this alleged exposure, Pack contends that he suffered pulmonary problems, consisting of sharp pains in his chest, shortness of breath, wheezing, reduced lung capacity and gastroenteritis. (*See* Compl. at ¶ IV–A; Pltff's Facts at ¶¶ 12-19; Plaintiff's Statement Pursuant to Rule 56.1 at ¶ 3; Defts' 56.1 Exhibit G, November 26, 2002 Deposition of Charles Pack ("Pack Dep.") at pp. 20–21, 68).

Plaintiff contends that all four defendants had knowledge of the asbestos exposure but "jointly, and separately, failed to exercise due regard for [his] safety and health ... by willfully allowing [him] to enter and remain in an area of [Green Haven], wherein [he] was continuously exposed to airborne asbestos, for a period of seven years." (Compl. at ¶¶ IV(26)). Pack now seeks three million dollars in compensatory damages and an equal amount in punitive damages. (*See id.* at ¶ V).

Pack's allegations in this action are substantially similar to those that he made in a negligence lawsuit filed against the State of New York on September 30, 1996 in the New York State Court of Claims. In that action, which was still pending when he brought the current lawsuit, he alleged that he had been exposed to friable asbestos as a result of inadequate asbestos maintenance and removal procedures at Green Haven. (*See* Defts' Ex. C).[4] Plaintiff received some discovery in the state case, and a very brief trial was held on November 17, 1999, at the conclusion of which the judge dismissed the complaint. (*See* Deft's Ex. D, Court of Claims Trial Transcript ("Tr.") at 8). This ruling was based upon the court's determination that plaintiff had failed to proffer evidence that he had been, or was likely to be, injured as a result of his alleged exposure to asbestos. (Tr. at 7–8).[5]

On December 24, 1999, defendants filed a motion in the current action that was denominated as one for summary judgment but which this Court analyzed as a motion to dismiss. (*See* R & R at p. 1). Defendants argued: (1) that plaintiff's claims for asbestos exposure were barred by the prior adjudication in the New York Court of Claims; (2) that plaintiff's claims were barred by the Eleventh Amendment; (3) that plaintiff's allegations did not state

4. Two notable differences existed between the current suit and Pack's Court of Claims action. First, in the Court of Claims he alleged only that he had been exposed to friable asbestos in the prison mosque and the J–School Counseling Unit (*See* Defts' Ex. C at ¶¶ 3 & 5), whereas here, he asserts that he was also exposed to asbestos in the Law Library and in several inmate housing blocks. (Compl. at ¶¶ IV(23)-(25)). Second, plaintiff presently sues four prison officials in their individual capacities (*see* Pltff's Memo of Law at p. 7), whereas the State of New York was the only defendant named in his prior action.

5. The presiding judge, the Honorable Thomas J. McNamara, issued the following written order after the trial: "Upon the motion of Defendant made at trial of this matter, alleging injury from exposure to asbestos, held at Green Haven Correctional Facility on November 17, 1999 and upon the failure to offer proof of a causally related physical ailment or increased likelihood of developing an asbestos-related impairment (*Doner v. Ed Adams Contracting, Inc.*, 208 A.D.2d 1072 [617 N.Y.S.2d 565 (3d Dep't 1994)]) and upon all the pleadings and proceedings heretofore had herein, it is, ORDERED that the claim be, and hereby is, dismissed." (*See* Report & Recommendation dated Sept. 5, 2000 ("R & R") (citing Order of McNamara, J. dated Nov. 17, 1998)).

a claim of constitutional magnitude; (4) that plaintiff had failed to allege and could not prove personal involvement on the part of defendant Christopher Artuz, the Superintendent of Green Haven; and (5) that all defendants were entitled to qualified immunity. Despite adequate notice, plaintiff did not respond to defendants' motion. (*See* R & R at pp. 1–2).

The District Court denied defendants' motion on August 21, 2001. (*See* Order of Marrero, J., adopting Sept. 5, 2000 R & R).[6] A period of discovery followed. On April 16, 2003, defendants filed a motion for summary judgment, pursuant to Fed. R.Civ.P. 56(c). This motion substantially reiterates the grounds argued in their previous motion, but also adds a body of evidentiary facts pertinent to the viability of plaintiff's claims. Plaintiff in turn has submitted papers in opposition.

### ANALYSIS

I. *Prior Adjudication by Court of Claims*

Defendants contend that the prior adjudication of plaintiff's negligence claims in the New York State Court of Claims bars Pack from bringing the current action. Specifically, they assert that the doctrines of collateral estoppel and *res judicata* prohibit Pack from litigating his section 1983 Eighth Amendment claim because, defendants argue, the factual issues presented by his federal complaint were previously

determined by the Court of Claims. Defendants contend this to be the case despite the fact that Pack's Eighth Amendment claim against state officials in their individual capacities could not have been heard in the prior suit. (*See* Defts' Memo of Law at pp. 22–24).[7]

This defense was previously asserted by defendants on the motion to dismiss, and the District Court squarely rejected it. Defendants do not explain why that ruling is not dispositive as law of the case. In any event, their arguments are meritless for the reasons outlined in our prior Report and Recommendation. Nonetheless, we again review the issue in some detail.

■ A federal court assessing the effect of a state-court judgment looks to the law of the state in which the judgment was entered. *See, e.g., Allen v. McCurry,* 449 U.S. 90, 99, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980); *Leather v. Eyck,* 180 F.3d 420, 424 (2d Cir.1999); *Kulak v. City of New York,* 88 F.3d 63, 71 (2d Cir.1996). Accordingly, we look to New York law on *res judicata* and collateral estoppel.

### A. Res Judicata/Claim Preclusion

■ New York has adopted a transactional approach to the doctrine of *res judicata,* so that "a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that

---

6. The District Court adopted the September 5, 2000 R & R except for the finding that Pack had not received a full and fair trial in the Court of Claims. The Court held that since there was not an identity of issues in the state-court trial and the federal proceeding, it was not necessary to review the fairness of the state-court hearing. (*See* Order dated Sept. 21, 2001 at p. 4).

7. The Court of Claims has jurisdiction over tort claims brought against the State of New York and against state employees sued in their official capacities. *See* N.Y. Ct. Cl. Act

§ 9(2); *Byas v. New York,* 2001 WL 1579552, at *2 (S.D.N.Y. Dec. 11, 2001); *Olsen v. New York State Dept. of Environmental Conservation,* 307 A.D.2d 595, 596, 762 N.Y.S.2d 538, 539 (3d Dep't 2003). The Court of Claims does not, however, have the authority to adjudicate claims, such as the ones in the current action, that are brought against state officials in their individual capacities. *See, e.g., Cox v. Colgane,* 1998 WL 148424, at *4 (S.D.N.Y. Mar. 27, 1998); *Cavanaugh v. Doherty,* 675 N.Y.S.2d 143, 146–47, 243 A.D.2d 92, 96–97 (3d Dep't 1998).

were or *could* have been raised in that action." *Monahan v. New York City Dept. of Corrections*, 214 F.3d 275, 285 (2d Cir. 2000) (citing *Allen v. McCurry*, 449 U.S. 90, 94, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980)) (emphasis added); *Cowan v. Ernest Codelia, P.C.*, 2001 WL 856606, at *4 (S.D.N.Y. July 30, 2001); *Waterman v. Transport Workers' Union Local 100*, 8 F.Supp.2d 363, 367 (S.D.N.Y.1998), *aff'd*, 176 F.3d 150 (2d Cir.1999). "[O]nce a claim is brought to a final conclusion, all other claims arising out of the same transaction or series of transactions are barred, even if based upon different theories or if seeking a different remedy." *Cox*, 1998 WL 148424, at *4 (quoting *O'Brien v. City of Syracuse*, 54 N.Y.2d 353, 357, 445 N.Y.S.2d 687, 688–89 (1981)). *See Smith v. Russell Sage College*, 54 N.Y.2d 185, 192, 445 N.Y.S.2d 68, 71, 429 N.E.2d 746 (1981) (noting that *res judicata* applies where different legal theories of relief are grounded on the same "congeries of facts," even when the different legal theories "depend on different shadings of the facts, or would emphasize different elements of the facts or would call for different measures of liability or different kinds of relief" (quoting *Restatement*, Judgments 2d [Tent Draft No. 5], § 61, Comment c)), *rehr'g denied*, 55 N.Y.2d 878, 448 N.Y.S.2d 1026, 433 N.E.2d 537 (1982).

■ However, a later claim arising from the same nucleus of facts as a previously adjudicated claim is not barred if the initial forum lacked the power to grant the full measure of relief sought in the later litigation. *See Jacobson v. Fireman's Fund Ins. Co.*, 111 F.3d 261, 265 (2d Cir. 1997); *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir.1994) (citing *Davidson v. Capuano*, 792 F.2d 275, 278 (2d Cir.1986)). Moreover, *res judicata* does not apply where "formal jurisdictional or statutory barriers" previously prevented the plaintiff

from "presenting to a court in one action the entire claim including any theories of recovery or demands for relief that might have been available to him under applicable law." *Jacobson*, 111 F.3d at 265 (quoting *Burgos*, 14 F.3d at 790).

■ Here, Pack previously asserted claims against New York State in the Court of Claims that arose from his alleged exposure to asbestos at the Green Haven facility. As noted, the Court of Claims has jurisdiction over tort claims brought against the State and over damages claims brought against state employees in their official capacities, *see* N.Y. Ct. Cl. Act § 9(2); *Byas*, 2001 WL 1579552, at *3; *Olsen*, 307 A.D.2d at 596, 762 N.Y.S.2d at 539, but not over claims brought against state officials in their individual capacities. *See, e.g., Cox*, 1998 WL 148424, at *4; *Cavanaugh*, 243 A.D.2d at 96–97, 675 N.Y.S.2d at 146–47. Therefore, the Court of Claims does not have the power to grant the "full measure of relief" sought in cases, such as the current one, where the plaintiff seeks to recover against state officials in their individual capacities. *See Burgos*, 14 F.3d at 790–91 (*citing Davidson*, 792 F.2d at 278). As such, courts in this district "have held that a later suit asserting claims against individuals is not barred by *res judicata*" where the same claims were, or could have been, litigated in the Court of Claims against either the State or state employees in their official capacities. *Cox*, 1998 WL 148424, at *4. *See Wright v. Coughlin*, 1987 WL 19633, at *1 (S.D.N.Y. Nov. 5, 1987), *aff'd*, 868 F.2d 1268 (2d Cir.1988). *Accord Gargiul v. Tompkins*, 790 F.2d 265, 272–73 (2d Cir.1986) (holding that, despite plaintiff having previously sued education officials for damages in their official capacities in an Article 78 proceeding, *res judicata* did not bar plaintiff's damage claims against education officials in their individual capacities because

such recovery is not available in the Article 78 context); *McGuire v. Switzer,* 734 F.Supp. 99, 110 (S.D.N.Y.1990) (same).

In Pack's current lawsuit, he sues defendants for damages in their individual capacities. Thus, *res judicata* may not be invoked to preclude his claims against these individual defendants.[8]

### B. Collateral Estoppel/Issue Preclusion

New York law forecloses a party from relitigating in a subsequent action or proceeding an issue *clearly raised* in a prior action or proceeding and decided against that party ..., whether or not the tribunals or causes of action are the same. The doctrine applies if the issue in the second action is identical to an issue which was raised, necessarily decided and material in the first action, and the plaintiff had a full and fair opportunity to litigate the issue in the earlier action.

*Leather,* 180 F.3d at 425 (quoting *Parker v. Blauvelt Volunteer Fire Co., Inc.,* 93 N.Y.2d 343, 349, 690 N.Y.S.2d 478, 482, 712 N.E.2d 647 (1999) and adding emphasis). *See Sullivan v. Gagnier,* 225 F.3d 161, 166 (2d Cir.2000); *Ryan v. New York Tel. Co.,* 62 N.Y.2d 494, 478 N.Y.S.2d 823, 826 (1984).[9]

The collateral estoppel doctrine applies irrespective of whether the tribunals or causes of action in the two proceedings are the same. *See Sullivan,* 225 F.3d at 166. Moreover, the parties in the two proceedings need not be identical in order for collateral estoppel to apply. Rather, the doctrine may be invoked by "a nonparty to the prior litigation ... [whose] own rights or obligations in the subsequent proceeding are conditioned in one way or another on, or [are] derivative of, the rights of the party to the prior litigation." *Juan C. v. Cortines,* 89 N.Y.2d 659, 667–68, 657 N.Y.S.2d 581, 585, 679 N.E.2d 1061 (1997) (quoting *D'Arata v. New York Cent. Mut. Fire Ins. Co.,* 76 N.Y.2d 659, 664, 563 N.Y.S.2d 24, 27, 564 N.E.2d 634 (1990)). *See Warney v. McMahon Martine & Gallagher,* 1998 WL 575188, at *3 (S.D.N.Y. Sept. 9, 1998).

The party invoking collateral estoppel must demonstrate the identity of the issues in the prior and current litigations and must establish that the issues were previously decided on the merits. The party seeking to defeat the application of collateral estoppel has the burden of establishing the absence of a full and fair opportunity to litigate the issues in the prior action. *See Warney,* 1998 WL 575188, at *2 (quoting *Kaufman v. Eli Lilly & Co.,* 65 N.Y.2d 449, 456, 492 N.Y.S.2d 584, 588, 482 N.E.2d 63 (1985)).

In this case, collateral estoppel cannot be applied to bar plaintiff's Eighth

---

8. The cases cited by defendants in support of their argument that *res judicata* bars the current action muddle the doctrines of *res judicata* and collateral estoppel. (*See* Defts' Memo at pp. 22–23 (citing *Ramsey v. Busch,* 19 F.Supp.2d 73, 85 (W.D.N.Y.1998); *Cox,* 1998 WL 148424, at *5; *Arce v. Scully,* 1998 WL 103181, at *2 (S.D.N.Y. Mar.9, 1998); *McChesney v. Colfield,* 1989 WL 49375, at *1 (S.D.N.Y. May 3, 1989); *Wright,* 1987 WL 19633, at *2)). A close reading of these cases, however, reveals that the courts found a preclusive effect of a prior Court of Claims action only when the elements of collateral estoppel—which we next address—were satisfied.

9. In contrast to *res judicata*/claim preclusion, which bars the litigation of claims that *could* have been raised in a prior proceeding, collateral estoppel/issue preclusion bars the relitigation of issues *actually* raised and decided in the prior proceeding, as long as that determination was essential to the prior judgment. *See Central Hudson Gas & Electric Corp. v. Empresa Naviera Santa S.A.,* 56 F.3d 359, 368 (2d Cir.1995) (emphasis added).

Amendment claim. First, the findings of the Court of Claims did not clearly and necessarily decide any issue that is dispositive of this claim. Second, plaintiff did not receive a full and fair opportunity to litigate the issues decided in the prior proceeding.

### 1. Identity of the Issues

In order for the prior Court of Claims decision to preclude plaintiff's current Eighth Amendment claim, the issues resolved by the state court must have been "identical" to one or more issues raised here. *See Central Hudson Gas & Electric Corp. v. Empresa Naviera Santa S.A.,* 56 F.3d 359, 368 (2d Cir.1995); *Parker,* 93 N.Y.2d at 349, 690 N.Y.S.2d at 482. If, however, the issues resolved in the earlier proceeding were different, then collateral estoppel does not apply.

We begin by examining the claims raised in plaintiff's prior action and the Court of Claims' findings. Pack sued the State of New York, alleging that it had been negligent in dealing with asbestos in the prison, and that as a result he had been exposed to friable asbestos, a "known carcinogen," over an extended period of time. (*See* Defts' Ex. C at ¶¶ 2–10). He also asserted, as a separate injury, that he had been unable to attend prison religious services, presumably because of the presence of asbestos in the space allocated to Muslim services, and had suffered mental distress as a result. (*See id.* at ¶ 12(b)).

Justice McNamara's findings of fact, both at trial and in his written order, did not address whether friable asbestos was present at Green Haven in the areas Pack alleged or whether Pack had been exposed. Indeed, during his colloquy with Pack at trial, the judge stated that he would at least assume that Pack had been exposed to asbestos. (Tr. at 5). Thus, the judge's findings were limited to a determi-

nation that Pack had failed to prove: (1) that he had suffered or was suffering from an ailment "causally related" to asbestos exposure in the prison, or (2) that there was "an increased risk of [his] developing an asbestos-related impairment" as a result of his exposure. (*See* Order dated Nov. 17, 1998; *see also* Tr. 7–8).

These findings appear to track the requirements of two versions of a common-law negligence claim that plaintiff may be viewed as having asserted in state court. If plaintiff's state-law negligence claim were viewed as one for physical harm, he would be required to prove that he had suffered injury as a proximate result of his exposure to asbestos. *See, e.g., Hattendorf v. State,* 2004 WL 1620800, at \*6 (N.Y.Ct.Cl. May 25, 2004) (defining *prima facie* elements of a common-law negligence claim). Judge McNamara explicitly found that plaintiff had failed to establish this link since he was unable to show that he had suffered or was suffering from an ailment "causally related" to the asbestos. (Tr. at 7–8; *see* Order dated Nov. 17, 1998).

If, on the other hand, plaintiff's complaint were broadly read to allege only emotional distress or "mental anxiety" resulting from his exposure to asbestos, he would be required to demonstrate both that he was in fact exposed to a "disease causing agent" and that there is a "rational basis" for his fear of contracting a disease. *See Prato v. Vigliotta,* 253 A.D.2d 746, 748, 677 N.Y.S.2d 386, 388 (2d Dept.1998) (setting forth *prima facie* elements of an emotional-distress claim based on exposure to a toxic substance). A "rational basis" has been construed to mean the clinically demonstrable presence of a toxin in the plaintiff's body, or some other indication of a toxin-induced disease. *Id.* at 748, 677 N.Y.S.2d at 388 (citing cases). *See also Doner,* 208 A.D.2d at 1072, 617 N.Y.S.2d at

566 (stating that to recover for emotional distress, a plaintiff must show actual exposure and a likelihood of contracting a disease as a result). Judge McNamara thus found that plaintiff had not established a "rational basis" for emotional distress when he held that plaintiff had failed to demonstrate either that he was suffering from an ailment "causally related" to the asbestos or that he faced "an increased risk of developing an asbestos-related impairment" as a result of his alleged exposure. (Order dated Nov. 17, 1998).

Plaintiff's current claim arises under the Eighth Amendment[10] rather than common-law negligence, and involves a somewhat different set of elements, potentially foreclosing collateral estoppel based on the Court of Claims decision. *See Saud v. Bank of New York*, 929 F.2d 916, 919 (2d Cir.1991) (noting that whether or not a prior adjudication will have a preclusive effect "depends in part on whether the same evidence is needed to support both claims, and whether the facts essential to the second were present in the first"). In order to prevail on an Eighth Amendment claim challenging the conditions of his confinement at Green Haven, Pack must satisfy the two-prong test articulated in *Farmer v. Brennan*, 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). First, he must show that the challenged conditions of his confinement were "objectively [and] sufficiently serious" so as to deny him "the minimal civilized measure of life's necessities." *Id.* at 834, 114 S.Ct. 1970; *Branham v. Meachum*, 77 F.3d 626, 630–31 (2d Cir.1996). In the context of a failure-to-protect claim, Pack must show that he was incarcerated "under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834, 114 S.Ct. 1970.

Second, Pack must demonstrate that prison officials acted with "a sufficiently culpable state of mind," *id.*, which the courts have defined as "deliberate indifference" to an inmate's health or safety. *Id.*; *Wilson v. Seiter*, 501 U.S. 294, 297, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991); *McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir.1999); *Hayes v. New York City Department of Corrections*, 84 F.3d 614, 620–21 (2d Cir.1996).

The Court of Claims never addressed the state of mind of the Green Haven officials. Rather, its findings pertained solely to plaintiff's failure to prove injury and causation. Accordingly, that earlier decision has no preclusive effect with respect to the "deliberate indifference" element of Pack's current claim. Our collateral-estoppel analysis therefore focuses exclusively on whether the state court's findings preclude plaintiff from satisfying the objective element of his Eighth Amendment claim—*i.e.*, that he was incarcerated "under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834, 114 S.Ct. 1970.

As noted, the objective element of the *Farmer* test requires that the alleged deprivation be "sufficiently serious such that the deprivation denied the minimal civilized measure of life's necessities." 511 U.S. at 834, 114 S.Ct. 1970; *Branham*, 77 F.3d at 630–31. The United States Supreme Court has held that when

> the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsi-

---

**10.** The conditions of a prisoner's confinement are subject to the courts' scrutiny on Eighth Amendment grounds. *See, e.g., Helling v. McKinney*, 509 U.S. 25, 35, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993); *Warren v. Keane*, 937 F.Supp. 301, 305 (S.D.N.Y.1996), *aff'd*, 196 F.3d 330 (2d Cir.1999).

bility for his safety and general well-being... The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—*e.g.*, food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment ....

*DeShaney v. Winnebago County Dept. of Social Servs.*, 489 U.S. 189, 199–200, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). This principle underpins the notion that "while the Eight Amendment does not mandate comfortable prisons ... neither does it permit inhumane ones." *Perri v. Coughlin*, 1999 WL 395374, at *7 (N.D.N.Y. Jun. 11, 1999). *See also Rhodes v. Chapman*, 452 U.S. 337, 348, 349, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981).

In the context of a prisoner's claim that prison officials failed to protect him from toxic exposure, "the Eighth Amendment protects against sufficiently imminent dangers as well as current unnecessary and wanton infliction of pain and suffering." *Helling*, 509 U.S. at 34, 113 S.Ct. 2475 (noting that inmates have been held to be entitled to relief under the Eighth Amendment when they proved threats to personal safety from exposed electrical wiring, deficient firefighting measures, and the mingling of healthy inmates with prisoners infected with serious contagious diseases). In other words, plaintiff need not show that he suffered actual injury in order to satisfy the objective prong of his Eighth Amendment claim, so long as he can demonstrate that "a substantial risk of serious harm exist[ed]" due to involuntary asbestos exposure. *Farmer*, 511 U.S. at 837, 114 S.Ct. 1970. *See Helling*, 509 U.S. at 33, 113 S.Ct. 2475 ("It would be odd to deny an injunction to inmates who plainly

proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them.").

Turning to plaintiff's Eighth Amendment claim, we note that, at first blush, the state court's finding that Pack had failed to show "an increased likelihood of developing an asbestos-related impairment" (Order dated Nov. 17, 1998) might be viewed as fatal to his current claim that he was imprisoned under conditions that posed "a substantial risk of serious harm." *Farmer*, 511 U.S. at 834, 114 S.Ct. 1970. In fact, however, it is not, for at least two reasons.

First, we read Justice McNamara's ruling as finding only that Pack did not show that he had been affected by past alleged exposure to asbestos in such a manner as to make it likely that he would develop an asbestos-related disease in the future. This inquiry presumably looked to plaintiff's physical condition at the time of the court proceeding in light of his prior exposure. In contrast, we view the Eighth Amendment inquiry as focusing upon the danger posed by the material itself, that is whether the nature and levels of friable asbestos were such as to pose "an unreasonable risk" of serious damage to the health of any inmate exposed to it. *Helling*, 509 U.S. at 36, 113 S.Ct. 2475. These two factual inquiries are separate and distinct, not "identical," and a determination of one adversely to plaintiff does not preclude his ability to prove the other.

Second, having reviewed the pleadings, the trial transcript and Justice McNamara's finding as to the likelihood of future illness, we conclude that the issue was not "clearly raised in [the] prior action." *Leather*, 180 F.3d at 425. As noted, the likelihood of future disease is a requirement under New York law for a claim of emotional distress based on toxic exposure.

*See Doner,* 208 A.D.2d at 1072, 617 N.Y.S.2d at 566. But in Pack's state-law complaint, he never explicitly asserted such a claim; indeed, his only allegation of emotional distress concerned his exclusion from the prison mosque and his consequent inability to practice his religion. He also testified that he was experiencing current physical problems that he attributed to the alleged asbestos exposure (Tr. 2–3), and he only obliquely raised the issue of the likelihood of future disease.[11] The Court, however, evaded any issue of future illness, responding, "Well, if I apply what the law in the State of New York is, you're going to have to show me some causal relationship. I can't assume that any problems you have breathing are related to an exposure to asbestos.". (Tr. 6).

Under these circumstances, we cannot say that plaintiff was explicitly pressing the argument that he could suffer future injury despite the absence of current illness, and we surely cannot say that this issue was "clearly presented."[12] Accordingly, for this reason as well, the state-court finding concerning future harm does not preclude plaintiff's current claim.

### 2. The Fullness and Fairness of the Prior Proceeding

As noted, even if the first suit resolved the very same factual issues as are raised in the second one, that prior determination will not be binding if the losing party did not have a full and fair opportunity to litigate the issue. Pack has the burden of proving the denial of such an opportunity, *see Warney,* 1998 WL 575188, at *2; *Kaufman,* 65 N.Y.2d at 456, 492 N.Y.S.2d at 588, 482 N.E.2d 63, but he has not raised such an argument in his response to defendants' motion for summary judgment. (*See* Pltff's Memo of Law at pp. 7–8). We nonetheless have before us a fairly complete record of what occurred in the Court of Claims (*see* Defts' Ex. D), and having reviewed the very brief, eight-page trial transcript from that prior proceeding, we are satisfied that plaintiff's opportunity to litigate the issues was not "full and fair." This too precludes giving the Court of Claims' decision preclusive effect.

---

11. Plaintiff raised the specter of future disease when he stated, "Your Honor, in the OSHA book, the Occupation and Safety Health Administration, it specifies that asbestos is something that don't be detected in the first few months of the stages. This is the developing stages as the years go by, after the fibers have entered into the lung tracks." (Tr. 6).

12. We note that relief may be available to a plaintiff under section 1983, even in the absence of a showing of current physical injury. This is because if he could establish that the levels of alleged asbestos exposure at Green Haven posed a significant risk of serious harm, then he would have proven an Eighth-Amendment violation and would be entitled to nominal damages. *See, e.g., Gibeau v. Nellis,* 18 F.3d 107, 111 (2d Cir.1994) (noting that "even when a [section 1983] litigant fails to prove actual compensable injury, he is entitled to an award of nominal damages upon proof of violation of a substantive constitu-

tional right.") (quoting *Smith v. Coughlin,* 748 F.2d 783, 789 (2d Cir.1984)); *Beyah v. Coughlin,* 789 F.2d 986, 989 (2d Cir.1986) (finding that even if a section–1983 plaintiff were "not [ ] able to establish actual damages … Beyah will be entitled to recover at least nominal damages"). *Cf. Crawford v. Artuz,* 1999 WL 435155, at *6 (S.D.N.Y. June 24, 1999) (noting that Second Circuit has not yet determined whether an inmate may obtain a monetary recovery for increased risk of physical injury in absence of claim of emotional distress, notwithstanding bar to recovery for mental anguish absent physical injury under the Prisoner Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(e)). However, as noted in *Crawford,* in the absence of proof of physical harm, Pack would be precluded by the PLRA, 42 U.S.C. § 1997e(e), from recovering damages for any emotional distress caused by the knowledge that he was exposed to the potentially damaging asbestos. *See* 1999 WL 435155, at *6.

There is no simple, formulaic test for determining whether a losing party had a "full and fair" opportunity to litigate the relevant issues. *Gilberg v. Barbieri,* 53 N.Y.2d 285, 292, 441 N.Y.S.2d 49, 51 (1981). Rather, "the basic concern is one of fairness." *Cruz v. Root,* 932 F.Supp. 66, 68 (W.D.N.Y.1996); *see also Gilberg,* 53 N.Y.2d at 291, 441 N.Y.S.2d at 50, 423 N.E.2d 807 (noting that because "the doctrine [of collateral estoppel] is based on general notions of fairness there are few immutable rules").

"In testing the fairness of the earlier litigation, all circumstances must be evaluated. This requires an exploration of the various elements which make up the realities of litigation." *Duverney v. New York,* 96 Misc.2d 898, 906, 410 N.Y.S.2d 237, 242–43 (N.Y.Ct.Cl.1978). Thus, when determining whether a prior proceeding was "full and fair," we must consider multiple factors. These include, but are not limited to, the nature of the forum; the importance of the issue in the prior proceeding; the incentive to litigate the issue and the actual extent of such litigation; the competence and expertise of counsel; the availability of new evidence; the differences in the applicable law; and the foreseeability of future litigation. *See, e.g., Conte v. Justice,* 996 F.2d 1398, 1401 (2d Cir.1993); *Ryan,* 62 N.Y.2d at 501, 478 N.Y.S.2d at 826, 467 N.E.2d 487; *Gilberg,* 53 N.Y.2d at 292, 441 N.Y.S.2d at 51.

In applying these factors, we first note that Pack was proceeding *pro se* in his prior action. While not in and of itself dispositive, his status is certainly a relevant factor in determining whether he was given a full and fair opportunity to be heard. *See, e.g., Cruz,* 932 F.Supp. at 69; *Clark v. Dept. of Correctional Services,* 564 F.Supp. 787, 789 (S.D.N.Y.1983). Moreover, a review of the very cursory trial demonstrates that, as a *pro se* plaintiff,

Pack was plainly not afforded such a chance.

After Pack was sworn as a witness (*see* Tr. 2), the court posed a brief set of questions to him. In response to these questions, he testified that he had been informed in 1996 that there was asbestos in the area used for Islamic religious services at the prison. (Tr. 2). He also testified that, prior to that time, he had been having problems with his "chest, breathing" and had repeatedly visited the hospital to deal with these ailments. (Tr. 2–3). According to plaintiff, a "Dr. Benhar (phonetic)" administered a pulmonary breathing test, which he failed, and, as a result, he was referred to St. Francis Hospital in Poughkeepsie, New York for further testing. (Tr. 3). The hospital's tests, he asserted, revealed that he "had a restricted defect in [his] lungs," which he claimed was due "to [him] being exposed to asbestos." (*Id.*).

The trial court did not invite plaintiff to offer into evidence any medical records, but rather asked whether Pack could produce "any medical proof that support[ed][his] connection between [ ] exposure to the asbestos and any pulmonary problems" he had experienced. (Tr. 3). This elicited a concession from Pack that the pulmonary test reports did not explicitly state that his breathing problems were causally related to asbestos exposure. (Tr. 4).

At this point, the court effectively terminated the trial, stating

there's two parts to [a right to recover for asbestos exposure]. One is exposure, and you may or may not be able to prove that; and for the purposes of what I'm doing now, I'll assume you were exposed to asbestos. The other part of it is the medical proof that causally relates any problem that you may have to that exposure, and you're telling me you

don't have that. There's nothing I can do. (Tr. 5–6). The court further remarked, "Well, if I apply what the law in the State of New York is, you're going to have to show me some causal relationship." (Tr. 6). The Assistant Attorney General then made an application to dismiss the claim (Tr. 7), which the court promptly granted for the following reasons:

> Mr. Pack, based upon the fact that there's no medical proof that you can offer relative to the exposure and the likelihood that you contracted any diseases related to exposure to asbestos, and given the fact that there's no medical testimony that you in fact have a medical condition which could be related to exposure to asbestos, I'm going to dismiss your claim.

(Tr. 7–8).

The court's abrupt termination of the proceeding plainly reflects the denial of a sufficient opportunity for Pack to develop the factual basis for his contention that asbestos exposure had caused his ailments. (Tr. 3, 6). For instance, rather than allowing Pack to introduce the documents in his possession that he contended indicated that he had been exposed to asbestos, the court merely assumed exposure had occurred for the sake of argument. (Tr. 5). This foreclosed the possibility of developing a record as to the extent of any asbestos contamination that existed at the prison or as to the extent of plaintiff's exposure to that asbestos. Both of these issues would be key determinants in assessing (a) whether plaintiff's asserted breathing problems were related to asbestos exposure and (b) whether his condition was likely to worsen in the future.

We further note that the court did not invite, or even permit, plaintiff to offer into evidence the medical records that he had referred to in his testimony, which might have indicated whether there was a basis for inferring that he suffered symptoms consistent with asbestos exposure. Rather than conducting any inquiry into the extent of the exposure and the nature of Pack's ailments and then evaluating the extent to which plaintiff could realistically prove causation by inference, the trial court simply asked whether Pack possessed any documentation that explicitly established a causal relationship between asbestos exposure and Pack's alleged pulmonary problems. (Tr. 3). When Pack could not provide this "smoking gun," the court simply ignored the possibility that other evidence might also serve to prove causation.

In sum, the court made no effort to assist or encourage Pack to present his case. Indeed, the transcript of the trial reads much like a cross-examination. The court insistently questioned Pack and interrupted him on several occasions. (Tr. 4–5). Ultimately, by our count, less than two pages of the eight-page transcript are actually filled by Pack's testimony.

Since Pack was proceeding *pro se,* he could hardly have been expected to object to the court's cursory treatment of his claim, much less to assert forcefully his interests in the face of interrogation. Moreover, the problem of the court's peremptory treatment was exacerbated by the fact that the case was particularly complex, as even the court noted. (Tr. 4 ("[Asbestos cases] [a]re very, very difficult cases . . . .")). Given Pack's status as an untutored, *pro se* plaintiff, he understandably was not aware of the high standard of medical evidence that he would be required to meet in order to prevail. He simply argued that he had an "obstruction in [his] lung" and appears to have thought that alleging causality and developing a record of asbestos exposure would be sufficient to demonstrate a causal connection

between the exposure and his ailments. (Tr. 4–5). Despite the fact that Pack lacked trained counsel, the trial judge gave him absolutely no latitude to make his case. Had he been aware of what evidence was required, however, he might, for instance, have asked the physicians at St. Francis Hospital whether asbestos was the likely cause of his ailments and requested that they prepare an appropriate report.

The trial before Justice McNamara was also inadequate insofar as the court failed explicitly to consider the possibility of a risk of future illness due to asbestos exposure. As noted, plaintiff obliquely referred to this issue but the court completely ignored it. (Tr. 6). Moreover, by failing to make a record that would reflect the extent of asbestos exposure, the court denied itself the evidence that would presumably be most pertinent to the assessment of the likely future effects of Pack's alleged asbestos exposure.

Finally, at the close of the proceeding, after Pack had requested a transcript of the hearing (Tr. 6–7), the court discouraged him from appealing the judgment when it stated, "given the state of the law in the State of New York, an Appellate Court is not going to do what I can't because they're the ones who created the law that I'm enforcing . . . ." (Tr. 7).

In assessing the adequacy of the Court of Claims proceeding, we may evaluate the care with which the prior court evaluated a particular issue, and the failure of that court to grapple in any meaningful respect with the key factual questions involved in that issue may preclude the application of collateral estoppel. *See, e.g., In re Sokol,* 113 F.3d 303, 307–08 (2d Cir.1997). Taking note of the haste with which the Court of Claims dismissed Pack's claim and the lack of opportunity it afforded him to present his claim in its entirety, we conclude

that his previous trial did not offer Pack a "full and fair" opportunity to be heard.

In sum, we conclude that the prior decision of the Court of Claims should not estop plaintiff from asserting his Eighth Amendment claim in this court. We therefore recommend that defendants' argument for summary judgment on this ground be rejected.

## II. *Applicability of the Eleventh Amendment*

Defendants argue that Pack has essentially sued them in their official capacities and that his claims are therefore barred by sovereign immunity, pursuant to the Eleventh Amendment. (*See* Defts' Memo of Law at p. 19).

■■■ This argument, which the Court previously rejected, is misguided. While the Eleventh Amendment bars plaintiffs from suing state officials for damages in their official capacities, *see In re Charter Oak Associates,* 361 F.3d 760, 765 (2d Cir. 2004); *Feliciano v. Goord,* 1998 WL 436358, at *2 (S.D.N.Y. July 27, 1998), it does not bar such suits against state officials in their individual capacities. *See Spencer v. Doe,* 139 F.3d 107, 111 (2d Cir.1998); *Feliciano,* 1998 WL 436358, at *2. Pack states that he is suing defendants in their individual capacities. (*See* Pltff's Memo of Law at p. 7). This assertion is consistent with the fact that his complaint seeks compensatory and punitive damages, neither of which would be recoverable against defendants if plaintiff were suing them solely in their official capacities. *See In re Charter Oak Associates,* 361 F.3d at 765. Thus, the Eleventh Amendment does not bar plaintiff's claims. We therefore recommend that defendants' argument for summary judgment on this ground be rejected.

## III. *Adequacy of Plaintiff's Eighth Amendment Claim*

Defendants contend that Pack has failed to provide sufficient evidence of facts that amount to a Eighth Amendment violation. (*See* Defts' Memo at pp. 9–16). Before addressing the merits of defendants' argument, we set forth the legal standards for summary judgment.

### A. Legal Standards

Under Fed.R.Civ.P. 56(c), the court may enter summary judgment only if there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. *See Feingold v. New York*, 366 F.3d 138, 148 (2d Cir.2004); *Johnson v. Ganim*, 342 F.3d 105, 112 (2d Cir.2003); *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 68 (2d Cir.2000). In determining whether summary judgment is warranted, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-moving party. *See Feingold*, 366 F.3d at 148; *Westinghouse Credit Corp. v. D'Urso*, 278 F.3d 138, 145 (2d Cir.2002) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Moreover, if the non-moving party is a *pro se* litigant, all pleadings by that party must be read liberally and "interpreted to raise the strongest arguments they suggest." *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir.2003) (quoting *McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir.1999)).

The moving party bears the initial burden of demonstrating the absence of a disputed material fact. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Feingold*, 366 F.3d at 148; *Koch v. Town of Brattleboro, Vermont*, 287 F.3d 162, 165 (2d Cir.2002). Where, however, the non-moving party has the burden of proof on a specific claim or defense at trial, the moving party need only demonstrate an absence of evidence in support of some essential element of that claim or defense. *See, e.g., Giannullo v. City of New York*, 322 F.3d 139, 141 n. 2 (2d Cir.2003); *PepsiCo, Inc. v. Coca–Cola Co.*, 315 F.3d 101, 105 (2d Cir.2002).

If the moving party fails to carry its initial burden of providing admissible evidence of facts entitling it to summary judgment, then the summary-judgment motion fails, even if the non-movant has not presented evidence establishing a genuine issue of fact. *See, e.g., Giannullo v. City of New York*, 322 F.3d 139, 141 (2d Cir.2003); *Amaker v. Foley*, 274 F.3d 677, 680 (2d Cir.2001); *Arce v. Walker*, 139 F.3d 329, 338 (2d Cir.1998). If, on the other hand, the moving party meets his initial burden, the non-movant, even if *pro se*, "may not rest upon [ ] mere allegations or denials" contained in the pleadings, but "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). *See, e.g., Celotex*, 477 U.S. at 324, 106 S.Ct. 2548; *Poe v. Leonard*, 282 F.3d 123, 128 n. 4 (2d Cir.2002); *Lee v. Coughlin*, 902 F.Supp. 424, 429 (S.D.N.Y. 1995) ("a *pro se* party's 'bald assertion,' completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment"). In other words, the non-movant must present evidence from which a reasonable inference as to a material issue of fact could be drawn in his favor. *See D'Urso*, 278 F.3d at 145.

### B. Application of Legal Standards to Pack's Eighth Amendment Claim

#### 1. *The Objective Element*

Defendants assert that Pack has failed to demonstrate a "sufficiently serious" deprivation for purposes of an Eighth Amendment violation because he has offered no proof that he is currently suffer-

ing from a physical condition so serious as to cause "death, degeneration or extreme pain," or that he is likely to develop such a condition in the future. (*See* Defts' Memo of Law at p. 10) (quoting *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir.1994)).

■ Defendants mischaracterize the nature of the deprivation that Pack must demonstrate in order to prevail. As previously discussed, the objective element of an Eighth Amendment claim requires a plaintiff to show that he was imprisoned under conditions posing "a substantial risk of serious harm." *Farmer*, 511 U.S. at 834, 837, 114 S.Ct. 1970. When a prisoner alleges a "substantial risk of serious harm" from involuntary exposure to a toxic substance, relief is available in the absence of physical injury, provided the plaintiff can show that the exposure "pose[d] an unreasonable risk of serious damage to his future health." *Helling*, 509 U.S. at 35, 113 S.Ct. 2475. This determination requires the fact-finder to consider

> the seriousness of the potential harm and the likelihood that such injury to health will actually be caused by exposure [to the toxin]. It also requires [the fact-finder] to assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such risk.

*Id.* at 36, 113 S.Ct. 2475 (original emphasis); *Crawford v. Artuz*, 143 F.Supp.2d 249, 259 (S.D.N.Y.2001). Bearing these criteria in mind, we must therefore assess whether—after drawing all inferences and resolving all ambiguities in favor of Pack— a reasonable fact-finder could conclude that he was exposed to levels of asbestos that posed an unreasonable risk of serious damage to his immediate or future health.

**a. Evidence of Asbestos Exposure**

For more than thirty years, friable asbestos—that is, asbestos that is exposed and readily crumbled, as opposed to contained—has been recognized as an environmental toxin. *See LaBounty v. Coughlin*, 137 F.3d 68, 74 n. 5 (2d Cir.1998). Exposure to friable asbestos poses a significant health risk because airborne particles or fibers can become lodged in a person's lungs and in his respiratory tract. Over time this can lead to asbestosis, a nonmalignant scarring of the lungs that causes extreme shortness of breath and often death; lung cancer; gastrointestinal cancer; and mesothelioma, a cancer of the lung lining or abdomen lining that develops as long as thirty years after the first exposure to asbestos and that, once developed, invariably and rapidly causes death. *See Environmental Encapsulating Corp. v. City of New York*, 855 F.2d 48, 50 (2d Cir.1988).

■ The health risk posed by friable asbestos has been acknowledged by various courts, which have held that inmates' unwilling exposure to an unreasonably high concentration of air-borne asbestos particles constitutes a cognizable claim under the Eighth Amendment. *See, e.g., LaBounty*, 137 F.3d at 72; *Herman v. Holiday*, 238 F.3d 660, 665 (5th Cir.2001); *Powell v. Lennon*, 914 F.2d 1459, 1463 (11th Cir.1990); *Klos v. Burke*, 1996 WL 77446, *1 (N.D.N.Y. Feb. 15, 1996).[13] For

13. In contrast, inmates' involuntary exposure to moderate levels of nonfriable asbestos has been held to be a common fact of contemporary life that cannot, under contemporary standards, be considered cruel and unusual. *See McNeil v. Lane*, 16 F.3d 123, 125 (7th Cir.1993) (finding no Eighth Amendment violation where inmate alleged that over a period of ten months he was exposed to asbestos-covered pipes directly outside his cell but did not allege facts sufficient to establish that he was exposed to unreasonably high levels of asbestos or that the air in his cell had been contaminated with friable asbestos particles).

exposure to airborne asbestos fibers to create a substantial risk of serious harm, however, the intensity and duration of the exposure must both be significant. *See Falise v. American Tobacco Co.*, 94 F.Supp.2d 316, 324 (E.D.N.Y.2000) (noting that development of asbestos-related diseases correlates with the duration and intensity of exposure to asbestos fibers). (*See also* Affidavit of Defendants' Medical Expert, Dr. Neil W. Schluger, sworn to March 25, 2003 ("Schluger Aff.") at ¶ 12 ("Asbestos-related diseases result from non-trivial exposures over long periods of time.")[14]; Pltff's Ex. F, Centers for Disease Control Asbestos Publications at p. 3 ("Available data show that the lower the exposure, the lower the risk of developing asbestosis and cancer."). *But see* Pltff's Ex. G, OSHA Publication 3110, "Access to Medical And Exposure Records" at p. 3–7 ("Current evidence indicates that there exists an increased risk of developing some asbestos-related disease with increases of asbestos exposure ... However, other studies have demonstrated that with brief low-level lung and gastro-intestinal exposures, asbestos-related diseases have appeared such as mesotheliomas and lung cancers."))

Pack alleges that for seven years between August 8, 1991 and November 24, 1998 he was exposed to friable asbestos at Green Haven Correctional Facility in the prison mosque, the counseling unit and the law library, all three of which are located in Building 21, which is known as the J Block or the J School. He also contends that over the same period of time he was exposed to airborne asbestos particles in housing blocks A, E, H and F. (*See* Compl. at ¶ IV(18)-(25); Pltff's Ex. H1 at first page; Pltff's Ex. J at seventh page).

Defendants do not deny the presence of asbestos in the challenged areas of Green Haven[15] but they contend that Pack was not exposed to unreasonably high levels of friable asbestos for any significant period while incarcerated there. (*See* Defts' Memo at p. 13). In support of this argument, defendants proffer an affidavit from Dan Gastin, who has served as the Asbestos Control Supervisor for Green Haven since May 1992. (*See* Defts' Ex. H, Affidavit of Dan Gastin, sworn to June 16, 2000 ("Gastin Aff.") at ¶¶ 1, 30–32). This affidavit was prepared in connection with *Crawford v. Artuz*, 143 F.Supp.2d 249 (S.D.N.Y. 2001), which involved allegations of asbestos-exposure in the same areas of Green Haven and during a portion of the same time period as are at issue here.

### 1. *Sankore at Taubah Mosque*

Gastin reports that only the east and west closets of the mosque were contaminated with asbestos, and that these areas were not normally used by inmates. (*See id.* at ¶ 4).[16] Gastin further reports that

14. Dr. Schluger is the Clinical Chief of Pulmonary, Allergy and Critical Care at Columbia–Presbyterian Medical Center in New York City. He specializes in the diagnosis and treatment of pulmonary diseases and regularly conducts research in areas including the treatment of respiratory infections, the epidemiology of tuberculosis infections and the treatment of emphysema. (*See id.* at ¶¶ 2–3).

15. In 1983 Green Haven officials generated responses to interrogatories in connection with a prior, prisoner-initiated, asbestos-exposure action, *Friedgood v. Axelrod*, No. 81–CV–

7938. In their responses, the defendants stated that Inmate Housing Blocks A, B, C, D, E, F, G, and H contain asbestos-covered pipes in the connecting catwalks and steam service rooms, and that Building 21 ("J" Block or "J" School) contains sprayed-on asbestos fireproofing. (*See* Pltff's Ex. H at pp. 1–3; Pltff's Ex. H1 at p. 1).

16. A September 1996 inspection by the New York State Department of Labor ("DOL") found possible asbestos exposure in the west closet and storage room of the mosque, but does not mention the east closet. (*See* Pltff's

the pre- and post-abatement air samples taken from those closets in October 1996 contained a level of asbestos particulates that was either so low as to be undetectable or else fell within acceptable limits as set by New York State's Industrial Code, 12 N.Y.C.R.R. § 56–17.8. (*See id.* at ¶¶ 5–9 and attached Exhibits A & B).[17]

Plaintiff asserts that prior to September 1996, he attended services and classes in the mosque, although he does not specify how frequently. (*See* Compl. at ¶ IV(3) & (18); Pltff's Facts at ¶ 9; Pltff's Ex. B (prison memos showing that Pack was authorized to attend services on Nov. 25, 1994, Feb. 23, 1995 and Mar. 18, 1995)). We presume, in the absence of an assertion otherwise, that neither the classes nor the services required Pack to spend extensive amounts of time, if any, in the contaminated closets or storage room.

Moreover, even if plaintiff had occasion to enter the contaminated areas, the evidence presented by defendants indicates: (1) that the pre-abatement levels of asbestos exceeded State guidelines by only .002 f/cc and .001 f/cc in two areas, respectively, and otherwise fell below .01 f/cc or were undetectable; (2) that the pre-abatement levels of asbestos never exceeded OSHA guidelines; and (3) that the asbestos contamination was abated by October 19, 1996. (*See* Ex. A attached to Gastin Aff.). Based on these facts, we find that the intensity and duration of Pack's exposure, if any, to friable asbestos in the contaminated areas of the prison mosque did not pose an unreasonable risk of serious damage to his health.[18]

## 2. Counseling Unit

With respect to the J–Block Counseling Unit, Gastin reports that on April 10, 1995, a number of ceiling tiles fell in the waiting area, where inmates would congregate before entering their counselors' private of-

Ex. J). Given, however, the small amount of suspect material found on the floor of the storage room and west closet, DOL inspectors declined to perform an air sampling in the mosque because they deemed it unlikely that airborne asbestos exposures were above 0.1 fiber per cubic centimeter ("f/cc"), which is the Permissible Exposure Limit ("PEL") set by the Occupational Safety and Health Administration ("OSHA"). (*See* Pltff's Ex. J at last page). Consistent with this prediction, none of the pre- or post-abatement air samples taken from the mosque's east and west closets after the DOL inspection revealed any concentration greater than 0.012 f/cc. (*See* Ex. A attached to Gastin Aff.).

17. New York's Industrial Code, 12 N.Y.C.R.R. § 56–17.8, states that "clearance air-monitoring results shall be considered satisfactory when every sample demonstrates an airborne concentration of asbestos fibers of less than 0.01 fiber per cubic centimeter." This standard is considerably more stringent than OSHA's PEL of 0.1 f/cc. We note that the October 2, 1996 samples taken in connection with the mosque's east closet, showed pre-abatement levels of 0.011 and 0.012 in two

areas, which results were slightly in excess of the Industrial Code requirement. However, the October 19, 1996 final air clearance tests showed a level of <0.005 for all areas tested in connection with the east closet, reflecting full compliance with the Industrial Code. (*See* Ex. A attached to Gastin Aff.).

18. We note that plaintiff submits an affidavit from William Alexander, a fellow inmate who worked as a certified asbestos handler at Green Haven. (*See* Pltff's Ex. Q at ¶ 4). Alexander attests that on July 16, 1998, he taped plastic sheeting over the holes left in the ceiling of the mosque where ceiling tiles had fallen in order to prevent inmates' and staff's exposure to friable asbestos. He further reports that the friable asbestos in the mosque was never encapsulated, as required by 12 N.Y.C.R.R. 56. (*See id.* at ¶¶ 4–5). The events to which Alexander attests, however, occurred almost two years after September 1996, which is when Pack ceased going to the mosque. (*See* Pltff's Facts at ¶ 9). Thus these events provide no basis for concluding that prior to September 1996, plaintiff was exposed to friable asbestos in the prison mosque.

fices. (*See id.* at ¶¶ 10–11). He reports that the area was immediately closed to inmates and staff and that all asbestos was removed by October 10, 1997 (two and a half years later). (*See id.* at ¶¶ 12, 15; *see also* Pltff's Ex. Q at ¶ 3; Pltff's Ex. M, Physical Completion Report for Asbestos Abatement at Green Haven Corr. Facility—J Building, Phase 5).[19]

Pack responds that asbestos contamination existed in the J Block as long as thirteen years prior to the April 10, 1995 incident recounted by Gastin, and that Green Haven officials took inadequate steps to protect inmates from exposure. Specifically, Pack states that asbestos contamination existed in the J Block as early as December 1982, when part of the ceiling in the AVP Unit collapsed.[20] Apparently, "[i]nmates were removed from [the] unit during repairs", which were made between December 1982 and February 1983. (Pltff's Facts at ¶¶ 26–27 (citing Ptff's Ex. H at pp. 9–12)).

Pack suggests that these repairs did not remedy the contamination, as evidenced by Green Haven officials' acknowledgment in late 1983 of the possibility that airborne asbestos particulates existed in the J Block due to inmates having removed ceiling tiles during inclement weather when the outer roof leaked. (*See* Pltff's Facts at ¶ 29 (citing Pltff's Ex. H at p. 12)). Pack further notes that while the outer roof was scheduled to be repaired by the summer of 1984 (*see id.*), any repairs made were inad-

equate because a leaky roof and falling ceiling tiles continued to plague the J Block in April 1995, as evidenced by an Officer Patterson's April 8, 1995 logbook entry that states "missing tiles, falling tiles and leaks [in the J–School Counseling Unit] have been reported to maintenance and Fire and Safety *many* times." (*See* Pltff's Facts at ¶ 29 (citing Pltff's Ex. C at p. 227) (original emphasis)).[21]

Finally, Pack refers to the September 1996 DOL asbestos inspection report, which found a potential risk of asbestos exposure in the counseling unit, as well as other areas of the J Block. (*See id.* at ¶ 31 (citing Pltff's Ex. J)). Pack complains that, in contrast to the evacuation of inmates from the J Block's AVP Unit during the 1982–83 roof repairs, the contaminated areas of the J Block identified by the 1996 DOL inspection, including the counseling unit, were not evacuated and were not encapsulated until at least December 30, 1996. (*See id.* at ¶ 32).

Pack provides no evidence for this last complaint. He cites a March 20, 1997 memo from J. LaGoy, Supervisor of the Green Haven Inmate Grievance Program, to the Inmate Grievance Program Committee, in which he states that "[a]ll J School areas identified as a health (asbestos) hazard have been encapsulated utilizing approved techniques. Asbestos removal will begin again in the near future." (Pltff's Ex. I). While LaGoy's memo is dated

19. The Counseling Unit did not remain closed throughout the entire two and a half years between April 10, 1995 and October 10, 1997. Plaintiff asserts that the counseling unit remained open until August 2, 1996 and that no notices of possible asbestos contamination were posted until on or about the last week of June 1996. (*See* Compl. at ¶ 19). Logbook entries reflect that, at a minimum, the Counseling Unit was open on May 18, 1995 and throughout July 1996. (*See* Pltff's Ex. C at pp. 221–39, 260).

20. It is unclear where the AVP Unit is located in the J–Block with respect to the counseling unit.

21. We note that a roof and ceiling tiles that were competently repaired in 1984 could nonetheless require further repair eleven years later.

almost four months after December 30, 1996, it does not indicate when the encapsulation occurred and thus provides no basis for concluding that it did not occur prior to December 30, 1996.

Moreover, a Green Haven Asbestos Project Notice indicates that full containment of "loose friable asbestos fire-proofing" on the second floor of the J–School, which is where the counseling unit is located (*see* Pltff's Facts at ¶ 3A), was scheduled to start on September 24, 1996. (*See* Pltff's Ex. B(3)). This project notice suggests that action was promptly taken in response to the DOL's asbestos inspection conducted earlier that month.

Drawing all inferences in favor of plaintiff, the evidence he marshals with respect to his alleged asbestos exposure in the counseling unit at most establishes that an unspecified concentration of airborne asbestos particles potentially existed at various times between December 1982 and October 10, 1997 due to the fact that inmates were allowed into the unit when ceiling tiles were missing, thus exposing the asbestos fire-proofing that had been made friable by water damage. Plaintiff, however, has presented no evidence regarding the intensity of the alleged exposure, which is necessary to enable a factfinder to determine whether it posed a unreasonable risk of serious harm.[22]

Moreover, plaintiff's opportunities for exposure, by his own admission, were very limited. While at Green Haven, plaintiff attended only twenty-one interviews in the counseling unit over a period of five years. (*See* Pltff's Facts at ¶¶ 5–6; Pltff's Ex. A). These interviews took place approximately four times a year (*see id.*), and presumably did not last longer than a few hours. Thus, even if the concentration of airborne asbestos particulates in the counseling unit violated the air-quality guidelines set by either the State or by OSHA—and plaintiff has offered no proof that it did—plaintiff's limited exposure, which consisted of a few hours every three months over the course of five years, was simply insufficient to allow a reasonable fact-finder to conclude that plaintiff endured an unreasonable risk of serious damage to his health.

3. *Law Library*

Asbestos Control Supervisor Gastin reports that the ceiling of Green Haven's law library consists of tiles, behind which are pipes lined with asbestos spray fireproofing, which is normally not friable.[23] Gastin attests that on December 20, 1996, he sealed all the holes in the library ceiling[24] and that since then he has immediately sealed all holes resulting from missing ceiling tiles about which he has been notified. (*See* Gastin Aff. at ¶¶ 26–29).

Plaintiff, on the other hand, asserts that falling ceiling tiles created a risk of asbestos exposure in the J Block, and thus presumably in the law library, as early as December 1982. Plaintiff further contends there was no visible debris on the floor of the library, which might indicate the presence of friable asbestos, and that no work was being performed in the area to disturb the building materials. (*See* Pltff's Ex. J).

22. For instance, it would be relevant to know whether the level of airborne asbestos particles in the counseling unit ever violated the air-quality standards established by either the New York Industrial Code or OSHA.

23. The DOL's September 1996 asbestos inspection report noted possible asbestos exposure in the law library, located on the first floor of the J School, due to the fact that some of the ceiling tiles were missing. The narrative of the report indicated, however, that

24. Nineteen ceiling tiles were missing from the law library ceiling as of November 6, 1996. (*See* Pltff's Ex. M, Grievance No. GH 36236–96 and attached IGRC Investigation Flow Sheet).

that subsequent repairs to J Block did not adequately remedy the problem. (*See* Pltff's Facts at ¶¶ 26–29). He also contends that Green Haven officials failed promptly to encapsulate the areas of the J Block, including the law library, that were identified as contaminated by the DOL's 1996 asbestos inspection report. (*See id.* at ¶¶ 31–32; Compl. at ¶ 23).

Even if we presume these contentions to be true and assume that Green Haven officials allowed inmates access to the law library during times when fallen ceiling tiles created a risk of exposure to friable asbestos, plaintiff's claim with respect to the library still fails. This is because plaintiff has neither alleged nor offered any proof that he spent any significant amount of time in the library, during which he could have been exposed. (*See* Compl. at ¶ 4 (stating merely that plaintiff had "call-outs to the law library")). Moreover, plaintiff has presented no evidence as to the intensity of the alleged exposure— *e.g.,* whether the level of airborne asbestos particles in the library violated state or national air-quality standards. Thus, in the absence of proof of either the duration or the intensity of plaintiff's purported asbestos exposure in the law library, a reasonable fact-finder could not conclude that plaintiff was subjected to an unreasonable risk of serious damage to his health.

4. *Housing Units A, E, F & H*

Gastin explains that Green Haven's Housing Units were constructed with a catwalk or "pipe gallery" (*see* Pltff's Ex. K) running between and behind each row of inmate cells and containing water pipes and utility wires. The water pipes are covered with asbestos insulation, which Gastin attests is usually non-friable.[25] The inmates' cells are separated from the catwalk or pipe galleries by a steel backing, which has openings for return ventilation. (*See id.* at ¶¶ 16–20; Pltff's Ex. K, Variance Petition filed April 21, 1995, "Reason for Request for Variance").[26]

According to Gastin, removal of asbestos from the pipe galleries was scheduled in the following manner:

| Block | Start Date | Anticipated Completion Date |
|---|---|---|
| A | November 24, 1995 | January 31, 1996 |
| B | February 5, 1996 | March 31, 1996 |
| E & F | January 18, 1998 | April 15, 1998 |
| G & H | July 20, 1998 | September 25, 1998 |

(*See* Gastin Aff. at ¶¶ 21–24 and attached Exhibit C). Gastin makes no representation as to when the asbestos-removal process for each housing block was actually completed, but states that by September 1998, all of the asbestos had been removed. (*See id.* at ¶ 25).

Plaintiff submits copies of several petitions for "variances" filed by DOCS with the DOL, which sought approval for proposed plans to remove asbestos insulation from the pipe galleries in Blocks A, B, C, D, E and F. (*See* Pltff's Ex. K). Pack asserts that these variance petitions provide evidence that friable asbestos existed in the pipe galleries of Blocks A, E and F

---

25. At some point, however, water damage, maintenance work and age caused the asbestos insulation in at least Cell Blocks A, B, C, D, E and F to deteriorate and become friable. (*See* Pltff's Ex. K, Variance Petition filed June 2, 1994 (File No. 675–94), "Reason for Request for Variance;" Variance Petition filed Jan. 4, 1995 (File No. 42–95), "Proposed Work Plan, Asbestos Abatement—Building 7;" Variance Petition filed July 21, 1995 (File No. 930–95), "Reason for Request for Variance").

26. Apparently, attic fans in the ceilings of the cell blocks pull air into the cells and "return ventilation is drawn on the pipe gallery," meaning that "[a]ir flows through the cells via vent ducts into the pipe gallery." (Pltff's Ex. K, Variance Petition filed April 21, 1995, "Reason for Request for Variance").

in which he was housed at Green Haven and that, as a result, he was exposed to airborne asbestos particles, in violation of his Eighth Amendment rights. (*See* Pltff's Facts at ¶¶ 34–38, 40). We therefore address the contents of the variance petitions and related DOL decisions pertaining to Blocks A, E and F.[27] We note that none of the petitions or decisions pertain to Block H, in which Pack was also housed and in which he also alleges he was exposed to friable asbestos. (*See id.* at ¶ 2; Compl. at ¶ II(C)(1)). It appears, however, that the pipe galleries of this block were also contaminated, since Gastin attests that asbestos removal was scheduled to occur in Blocks G and H between July and September of 1998. (*See* Gastin Aff. at ¶ 21).

### (a) Block A

On January 24, 1995, the DOL issued a decision approving a variance petition filed on January 11, 1995 for removing approximately 6,300 linear feet of asbestos-containing pipe insulation, along with associated debris, in the pipe galleries of Blocks A and B. Plaintiff argues that asbestos contamination existed in Blocks A and B since sometime before August 10, 1993. (*See* Pltff's Facts at ¶ 38). He bases this assertion on the fact that one of the floor plans included in the variance petition for Blocks A and B is dated August 10, 1993 and captioned "Asbestos Abatement, Correctional Facility, Block Pipe Gallery." (*See* Pltff's Ex. K, Variance Petition 42–95, filed Jan. 11, 1995 at Drawing A–1). We note, however, that nothing on the drawing dated August 10, 1993 identifies it as being a representation of either Block A or Block B.

The DOL's approval of the variance for Blocks A and B was conditioned on Green Haven's compliance with the preparation, removal and encapsulation procedures proposed in the variance petition, as well as with various additional procedures imposed by the DOL. Specifically, in preparation for asbestos removal, the DOL required that the return ventilation ducts connecting the pipe galleries to the inmates' cells be cleaned and sealed with two layers of six-millimeter polyethylene, presumably to prevent friable asbestos from entering inmates' cells. (*See* Pltff's Ex. K, DOL Decision dated Jan. 24, 1995 at pp. 2–3; *id.*, Variance Petition 42–95, Proposed Procedures and Proposed Work Plan).

The variance terminated on September 15, 1995. (*See* Pltff's Ex. K, DOL Decision dated Jan. 24, 1995 at p. 4). Two months later, Corcraft, the company conducting the asbestos removal, requested that the DOL renew the variance through April 1, 1996 because the removal had not been completed. (*See id.*, Letter dated Nov. 15, 1995 from Sean Waite, Asbestos Control Coordinator, to Daniel Sullivan, Principal Safety & Health Engineer). It appears that this request was granted. Nothing in the evidentiary record indicates the exact date when asbestos removal from the pipe galleries of Blocks A and B was completed.

### (b) Blocks E and F

On August 2, 1995, the DOL issued a decision in response to a variance petition filed on July 21, 1995, approving the removal of asbestos pipe insulation from the pipe galleries of the Blocks E and F. (*See* Ptlff's Ex. K, DOL Decision dated Aug. 2, 1995 at p. 2). The variance describes in

---

**27.** We do not address the contents of the variance petitions and DOL decisions submitted by plaintiff that pertain to Blocks C and D since these blocks were not housed in the same buildings as Blocks A, E, F and H where plaintiff claims he was exposed. (*See* Pltff's Ex. K, DOL Decision dated Aug. 3, 1994 at p. 2; Variance Petition 42–95, Proposed Work Plan, Asbestos Abatement—Building 7; DOL Decision dated Aug. 2, 1995 at p. 2; Pltff's Ex. H1 at p. 3).

some detail the asbestos contamination existing in the pipe galleries.[28] The petition further notes that "overcrowding in the prison system makes consideration of moving inmates out of the cell block not feasible at this time," but goes on to outline proposed procedures for safely removing the asbestos while the cell blocks are occupied. (*See id.*, "Proposed Procedures").

In its August 2, 1995 decision, the DOL: (1) approved the proposed procedures, including the sealing of the ventilation ducts leading to the inmates' cells prior to the commencement of asbestos removal; (2) imposed several additional procedures; and (3) ordered that the removal process comply with all other applicable provisions of the State Industrial Code Rules 56–1 through 56–17, which regulate hazards to public safety and health, during the removal, encapsulation, enclosure or the disturbance of friable asbestos, or any handling of asbestos material that may result in the release of asbestos fiber. (*See* Pltff's Ex. K, DOL Decision dated Aug. 2, 1995 at pp. 2–3; 12 NYCRR 56–1.1).

The variance for Blocks E and F was originally ordered to terminate on December 31, 1995 (*see* Pltff's Ex. K, DOL Decision dated Aug. 2, 1995 at p. 5), but on November 15, 1995, the DOL extended the variance until July 31, 1996. (*See id.*, DOL Decision dated Nov. 15, 1995 at p. 2). Nothing in the evidentiary record indicates the exact date when asbestos removal from the pipe galleries of Blocks E and F was completed, although it appears that it continued at least through March 27, 1997 because plaintiff reports that on this date he sealed sixty-four holes in the air venti-lation ducts in his F Block cell to keep out friable asbestos. (*See* Compl. at ¶ 25).

(c) **Reasonable Inferences Regarding the Duration and Intensity of Asbestos Exposure in Blocks A, E, F and H**

Drawing all inferences and resolving all ambiguities in plaintiff's favor—as we are required to do for purposes of summary judgment—the contents of Gastin's affidavit and of the several variance petitions submitted by plaintiff enable a reasonable fact-finder to conclude that asbestos contamination existed in the pipe galleries of Block A, starting sometime before August 1993; in the pipe galleries of Blocks E and F, starting sometime before July 1995; and in the pipe galleries of Block H starting sometime after July 1998. Moreover, we must infer that the contamination in each of these blocks continued until possibly as late as September 1998, which is when Gastin reports that all asbestos from all the housing blocks had been removed. (*See* Gastin Aff. at ¶ 25). It can also reasonably be inferred that the asbestos contamination in the pipe galleries resulted in some amount of friable asbestos entering the inmates' cells through the return ventilation ducts, although less than would have been the case had the air entered, rather than exited, the cells via the ventilation ducts.

Without knowing the exact dates when the asbestos in the various pipe galleries became friable, when asbestos removal from the various pipe galleries was complete, or when plaintiff resided in Blocks A, E, F and H, respectively (*see* Defts' Ex. G, Pack Dep. at pp. 69–71), we must again

---

**28.** The "Reason for Request for Variance" states, "There is over 6,300 [linear] ft. of ACM pipe insulation located in the pipe galler[ie]s ... Nearly all of this insulation is water damaged. Much of the pipe covering is physically damaged and dislodged due to abuse, mainte-nance in the area and age. Because of this damage and the confines of the area most of the surfaces in the pipe gallery are considered contaminated. Large pieces of ACM are lying on ledges and other components." (Pltff's Ex. K, Variance Petition filed April 21, 1995).

resolve all ambiguities and draw all inferences in favor of plaintiff and presume that throughout the entire seven years that he remained at Green Haven he was housed in cells that were connected, via return-ventilation ducts, to asbestos-contaminated pipe galleries, thus exposing him to some amount of friable asbestos throughout his entire seven-year incarceration at the facility.

Defendants' medical expert, Dr. Schluger, suggests that this duration—which he inexplicably calculates as totaling nine, rather than seven, years—was trivial. (*See* Schluger Aff. at ¶ 13).[29] A reasonable trier of fact could disagree. Plaintiff presumably spent some percentage of each day at Green Haven in his cell, and he certainly spent every night there. Thus, we estimate that at a minimum he spent an average of twelve hours out of every twenty-four in his cell. Common sense suggests that twelve hours of exposure a day for a period of seven years amounts to a significant duration. Since Dr. Schluger offers no explanation for why he characterizes this potential duration as trivial, we find no compelling basis for adopting his assessment with respect to the length of the alleged exposure.

As for the intensity of the exposure, Dr. Schluger also characterizes it as trivial, again without explanation. (*See* Schluger Aff. at ¶ 13). On this point, however, plaintiff has failed to present any evidence from which a reasonable fact-finder could conclude that the exposure was intense enough that, when coupled with the seven-year duration, it posed an unreasonable risk of harm to plaintiff's health.

Plaintiff proffers no evidence as to the concentration of airborne asbestos fibers that allegedly contaminated his housing cells. Plaintiff instead contends that *any* amount of asbestos fibers posed an unreasonable risk of serious damage because at least as recently as May 9, 1990, the National Institute of Safety and Health ("NIOSH") took the position that no level of asbestos exposure is safe. (*See* Pltff's Facts at ¶ 22 (citing Pltff's Ex. F, NIOSH Statement of Policy attached as last page to Centers for Disease Control Asbestos Publications)). Assuming that NIOSH currently adheres to this position, it still does not establish that any amount of asbestos exposure, no matter how small, creates an unreasonable risk of serious damage for purposes of an Eighth Amendment claim.

The Supreme Court has held that in order for involuntary toxic exposure to violate the Eighth Amendment, the amount of exposure must violate contemporary standards of decency. *See Helling*, 509 U.S. at 36, 113 S.Ct. 2475. *See also Crawford*, 143 F.Supp.2d at 259. Contemporary standards of decency currently allow for some amount of asbestos exposure as reflected by the fact that, pursuant to the New York State Industrial Code, 12 N.Y.C.R.R. § 56–17.8, 0.01 f/cc of asbestos fibers in the air constitutes a satisfactory clearance air-monitoring result. Contemporary standards of decency are also reflected by OSHA's regulations that allow

---

29. Dr. Schluger has served as defendant medical expert in at least three other prisoner asbestos-exposure suits, where prison officials successfully argued that no Eighth Amendment violation had occurred based on the absence of a serious deprivation. *See Nunes v. Artuz*, 2003 WL 22952743, at *6–7 (S.D.N.Y. Dec. 12, 2003); *Laureano v. Pataki*, 2003 WL 841067, at *5–6 (S.D.N.Y. Mar. 6, 2003); *Crawford v. Artuz*, 143 F.Supp.2d 249, 256–57 (S.D.N.Y.2001). Both *Nunes* and *Crawford* involved allegations of asbestos exposure in many of the same areas of Green Haven and during some of the same period of time as are at issue here. *See Nunes*, 2003 WL 22952743, at *1–2; *Crawford*, 143 F.Supp.2d at 250–55.

employers legally to expose workers to airborne asbestos fibers so long as the concentration does not exceed 0.1 f/cc. *See* 29 C.F.R. § 1926.1101(c)(1).

Thus, in order for Pack to demonstrate that the asbestos exposure he encountered in his Green Haven housing cells violated contemporary standards of decency, he would have to show that the concentration at least exceeded the limit imposed by the New York Industrial Code, if not the higher limit set by OSHA. In the absence of such evidence, some medical proof that plaintiff suffers from an asbestos-related disease, or is likely to suffer from such a disease in the future, would be necessary for a reasonable fact-finder to infer that the concentration of airborne asbestos fibers in plaintiff's housing cells violated the Eighth Amendment. Unfortunately, plaintiff has provided no such proof.

### (d) Medical Evidence

After reviewing Pack's medical records, including his chest x-rays, Dr. Schluger concluded that Pack currently evidences no symptoms of pulmonary or any asbestos-related diseases. (*See* Schluger Aff. at ¶¶ 5–7). He also predicts that because of the "trivial" intensity of the alleged exposure and the absence of any lesions in Pack's lungs, "plaintiff is not likely to develop any asbestos-related disease in the future," such as the form of cancer known as mesothelioma. (*Id.* at ¶¶ 12–14).

In response, Pack points to his medical records, which reflect that as early as March 22, 1992—seven months after his arrival at Green Haven—he was diagnosed with gastroenteritis (*see* Pltff's Ex. El), the symptoms of which he asserts are consistent with the documented effects of asbestos exposure. (*See* Pltff's Facts at ¶¶ 11–

12).[30] We assume that Pack is basing this assertion on page 92 of NIOSH's Revised Recommended Asbestos Standard publication, which appears to have been issued sometime in the late 1970's or early 1980's, and which states that "[m]esotheliomas, lung and gastrointestinal cancers have been show to be excessive in occupationally exposed persons . . . ." (Pltff's Ex. F).

NIOSH's reference to gastrointestinal cancers, however, does not establish causation in Pack's case. Not only has he never been diagnosed with gastrointestinal cancer, but he has presented no evidence that gastrointestinal cancer involves symptoms similar to those of gastroenteritis. Moreover, even if he could establish that he suffered from gastrointestinal cancer, this would not necessarily prove that asbestos exposure had caused it.

Finally, the fact that plaintiff was diagnosed with gastroenteritis seven months after arriving at Green Haven suggests that the condition is unrelated to any asbestos exposure he encountered there, since asbestos-related diseases typically develop ten years to forty years after the time of initial exposure. *See Environmental Encapsulating Corp.*, 855 F.2d at 50. (*See* Schluger Aff. at ¶ 12; Pltff's Ex. F, Centers for Disease Control Asbestos Publications at p. 313; Pltff's Ex. G, OSHA publication titled "Access to Medical and Exposure Records" at pp. 3–7, 3–10, 3–12).

Plaintiff also points to his medical history of chest pains, wheezing, breathlessness and decreased lung capacity (*see id.* at ¶¶ 14, 16–17, 19), which he again attests are consistent with asbestos exposure. (*See id.* at ¶¶ 15, 18, 20). Pack's medical records reflect that: (1) in the first half of 1993 and in May 1997 he suffered sharp chest pains that disturbed his sleep (*see*

---

30. "Gastroenteritis" refers to inflammation of the lining membrane of the stomach and the intestines. *See* http://www2.merriamweb- ster.c om/cgibin/mwmednlm?book=Medical & va=gastroenteritis.

Pltff's Exs. E2—E6, E13, E16); (2) in February 1996 he complained of anterior chest pain when he bent down and reported having experienced intermittent dizziness and lightheadedness for two years (Ex. E20); (3) in February and December 1997 he experienced shortness of breath and, when breathing normally, sharp chest pains (Exs. E9, E14); (4) in November and December 1997 and in March 1998 he experienced sporadic wheezing (Exs. E8, E10, E11, E15, E18); (5) in December of 1997 Dr. Steven Frost at Saint Francis Hospital in Poughkeepsie, New York found a possible restrictive defect in Pack's lung capacity but noted that lung volume studies were necessary to confirm this diagnosis (Ex. E17); (6) in February 2002 he reported chest pain and some shortness of breath during physical exertion (Ex. E21) and (7) in March 2002 he reported having constant chest pain "like needles" that would last "a couple hours." (Ex. E23).

While some of plaintiff's reported physical complaints are not inconsistent with asbestos-related diseases, he has presented no evidence that his symptoms were actually caused by asbestos exposure. For instance, asbestosis, which is a non-malignant scarring of the lungs, can cause shortness of breath, *see Environmental Encapsulating Corp.*, 855 F.2d at 50, as can lung cancer. (*See* Pltff's Ex. G, OSHA Publication 3110, "Access to Medical and Exposure Records" at p. 3–12). Asbestosis and lung cancer, however, are presumably not the only causes of such a generic symptom, thus precluding an automatic inference that plaintiff's shortness of breath was due asbestos exposure.

Similarly, dull chest or shoulder pain which reaches the point of interfering with sleep may be a symptom of lung cancer (*see id.*), but lung cancer is certainly not the only cause of chest pain. Thus, since none of the medical records submitted by plaintiff indicate or even hypothesize that his reported symptoms might be related to asbestos exposure, there is no basis on which a reasonable fact-finder could conclude that plaintiff's physical complaints resulted from an asbestos-related disease.[31] *See, e.g., Nunes,* 2003 WL 22952743, at *6 (finding no basis for concluding that plaintiffs suffered from asbestos-related diseases when they had failed to present evidence that established a causal link between asbestos exposure and their various diagnoses and complaints of lung disease, breathing difficulties, chest pains, heart deficiency, "pleural plaque/thickening of the lung" and dyspnea); *Laureano,* 2003 WL 841067, at *5 (finding no basis for concluding that plaintiff's cough indicated an asbestos-related disease since the cough was entirely consistent with plaintiff's prior medical history of gastroesophageal disease, and not a symptom specifically indicative of a pulmonary defect).

Moreover, we note that Pack's medical records indicate that he enjoyed relatively good pulmonary health in late 1996 and into 1997. Specifically, an x-ray report dated September 30, 1996 indicates that Pack's "lungs [are] free of infiltrates and effusions. Pulmonary vascularity is normal." (Pltff's Ex. E7). A December 17, 1997 Report of Consultation by Dr. M. Rahman at Saint Francis Hospital in Poughkeepsie, New York indicates that Pack "has occasional chest pain and [shortness of breath ('SOB')]," but describes Pack's lungs as being "clear to ausculta-

---

**31.** In our previous Report and Recommendation, we suggested that Pack might ask the physicians at Saint Francis Hospital whether asbestos was the likely cause of his ailments and request that they prepare an appropriate report. (*See* R & R at p. 24–25). Plaintiff, however, apparently did not seek such a report or else was unable to procure one.

tion. No wheezes or rales." (Pltff's Ex. E9). Dr. Rahman concluded that Pack suffered from high blood pressure, a transient cardiac dysfunction, and possibly angina. He recommended a low salt diet and loss of weight. (*Id.*). Nowhere does the report indicate that plaintiff may have been experiencing symptoms of asbestos exposure. Thus, plaintiff has presented no evidence from which one could conclude that he is currently suffering from an asbestos-related disease.

As for the likelihood of Pack's developing such a disease in the future, Dr. Schluger predicts that the odds are very low (*see* Schluger Aff. at ¶¶ 13–14), and plaintiff has submitted no evidence that suggests otherwise. While asbestos-exposed individuals may develop related diseases ten to forty years after the initial exposure, and while it has only been thirteen years since August 1991, when Pack was allegedly subjected to his first exposure at Green Haven, plaintiff, as noted, has failed to proffer evidence that he was subjected to sufficiently intense concentrations of airborne asbestos fibers to create an unreasonable risk of future manifestations of injury. *See, e.g., Nunes,* 2003 WL 22952743, at *7 (finding no unreasonable risk of future injury where the plaintiffs failed to provide any evidence in support of their conclusory allegations and where Dr. Schluger attested that "no[ne of the] plaintiff[s was] likely to develop any asbestos-related disease in the future"); *Crawford,*

143 F.Supp.2d at 260–61 (finding no unreasonable risk of future injury where Dr. Schluger predicted that it was "extremely unlikely" that the alleged asbestos exposure "would ever manifest in any asbestos-related disease" and where plaintiffs' only rebuttal evidence consisted of their contention that no level of asbestos exposure is safe and a 1980 OSHA publication stating that "significant disease can occur" in a person after one day of exposure).[32]

Thus, in the absence of evidence as to the intensity of the alleged asbestos exposure, and in the absence of any medical evidence of an asbestos-related illness that would allow an inference to be drawn regarding the intensity, a reasonable factfinder could not conclude that the alleged exposure, which we presume occurred over a period of seven years, was intense enough to pose an unreasonable risk of serious damage to Pack's health.

**b Summary of Findings with Respect to the Objective Element of Eighth Amendment Claim**

█ Drawing all inferences and resolving all ambiguities in Pack's favor, we conclude that with respect to the prison mosque, the counseling unit and the law library, plaintiff has failed to present evidence of either the intensity or the duration of his alleged exposure that would enable a reasonable fact-finder to conclude that he was subjected to an unreasonable risk of serious damage to his

---

**32.** While OSHA Publication 3110 states that some studies have shown that low levels of lung and gastrointestinal exposure may lead to lung cancer or mesotheliomas, the publication indicates that this fact may be related to the genetic susceptibility of the individual to the carcinogenic effects of asbestos. (*See* Pltff's Ex. G at p. 3–7). In other words, not everyone who encounters low levels of friable asbestos will develop a related disease. Thus the risk resulting from low-level exposure is not unreasonable for purposes of an Eighth

Amendment claim, since to violate contemporary standards of decency, the risk must apply to anyone who is subjected to the low level exposure—not just individuals who are genetically predisposed to cancer. *See Helling,* 509 U.S. at 36, 113 S.Ct. 2475. Moreover, as previously discussed, contemporary standards of decency, as reflected in the New York State Industrial Code and OSHA regulations, allow for low levels of asbestos exposure even though NIOSH and OSHA recognize that no level of exposure is completely "safe."

present or future health. With respect to housing Blocks A, E, F and H, even if we presume that Pack was exposed to friable asbestos in his dormitory cell throughout his entire seven-year incarceration at Green Haven, he has failed to present evidence—pertaining either to the concentration of airborne asbestos fibers or an asbestos-related disease—that would enable a reasonable fact-finder to conclude that the intensity of the exposure posed an unreasonable risk of serious damage to plaintiff's health. As such, plaintiff cannot satisfy the objective element of his Eighth Amendment claim.

### 2. The Subjective Element

■ Defendants contend that plaintiff has failed to establish facts from which one could infer that they acted with "deliberate indifference." (*See* Defts' Memo at pp. 14–16). In the context of a failure-to-protect claim, "a prison official has sufficient culpable intent if he has knowledge that an inmate faces a substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate the harm." *Hayes v. New York City Dept. of Corrections,* 84 F.3d 614, 620 (2d Cir.1996). *See Hathaway,* 37 F.3d at 66.

Here, we have already determined that plaintiff is unable to show that he faced a substantial risk of serious harm due to the fact that he is unable to establish that asbestos exposure posed an unreasonable risk of serious damage to his health. Without evidence that such a risk existed, Pack cannot possibly establish that defendants knew about it. He therefore fails to satisfy the subjective element of his Eighth Amendment claim. The evidence proffered by Pack is insufficient to allow a reasonable fact-finder to find in his favor with respect to either the objective or the subjective components of his Eighth Amendment claim. As such, the claim

fails as a matter of law. It is therefore unnecessary to address whether plaintiff has established the personal involvement of defendants Artuz and Haponik for purposes of liability under section 1983 or whether defendants are entitled to qualified immunity. (*See* Defts' Memo at pp. 16–18, 24–24). We therefore recommend that the court grant defendants' motion for summary judgment with respect to Pack's Eighth Amendment Claim.

### 3. Summary of Assessment of Eighth Amendment Claim

The evidence proffered by Pack is insufficient to allow a reasonable fact-finder to find in his favor with respect to either the objective or the subjective components of his Eighth Amendment claim. We therefore recommend that the court grant defendants' motion for summary judgment with respect to Pack's Eighth Amendment Claim.

### IV. The First Amendment Claim

■ Plaintiff invokes the First Amendment as an alternative basis for relief in his *pro se* complaint but does not offer any factual allegations to distinguish this claim from his Eighth Amendment "conditions of confinement" claim. At best, we may infer a possible if unstated theory that the conditions in the Sankore at Taubah Masjid interfered with his religious observances. Even if we infer such a theory, the evidence, as noted, reflects only minute asbestos contamination, which in any event was limited to two closets not normally used by inmates. Under these circumstances, a trier of fact could not conceivably find an interference with plaintiff's ability to pursue his religion even if we assumed that a prison administrator's failure to address asbestos problems in a prison religious center could constitute a First Amendment violation.

## CONCLUSION

For the reasons stated, we recommend that defendants' motion for summary judgment be granted.

Pursuant to Rule 72 of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of Court and served on all adversaries, with extra copies to be delivered to the chambers of the Honorable Victor Marrero, Room 414, 40 Centre Street and to the chambers of the undersigned, Room 1670, 500 Pearl Street, New York, New York 10007. Failure to file timely objections may constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. *See Thomas v. Arn*, 474 U.S. 140, 150, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Small v. Secretary of Health and Human Services*, 892 F.2d 15, 16 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

September 2, 2004.